# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

|  |  |  |
|---|---|---|
| JEREMY MCKNIGHT, | ) | **No. 1:24-cv-00119** |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | **ANSWER TO AMENDED AND** |
|  | ) | **RESTATED COMPLAINT** |
| CRST EXPEDITED, INC. and CRST | ) |  |
| LINCOLN SALES, INC., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

Defendants CRST Expedited, Inc. and CRST Lincoln Sales, Inc. hereby answer and defend Plaintiff's Amended and Restated Complaint as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of this matter is granted to this Court by 28 U.S.C. §§ 1331 (federal question jurisdiction), and 1337 (proceedings arising under an act of Congress regulating commerce). The causes of action alleged here arise under the laws of the United States regulating commerce and the activities of motor carriers engaged in the transportation of property in interstate commerce, including 49 U.S.C. §§ 13501, 14102 and 14704(a)(l) and (2), and 49 C.F.R. § 376 *et seq*. The Court also has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C. §1367.  The Court has original and supplemental jurisdiction over Plaintiff's claims filed against each defendant concerning their violations of The Federal Vehicle Information and Cost Savings Act (the "Odometer Act" or the "Act"), 49 U.S.C. §§ 32701 and 32710(a)-(b) *et. seq.*

**ANSWER: Admitted.**

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 139l (b) in that CRST

Transportation and CRST Lincoln are incorporated in Iowa, but they maintain their principal place of business in Jefferson County, Alabama. Also, events giving rise to the claims raised herein occurred in this district and state.

**ANSWER: Defendants admit venue is proper in this court. The remaining allegations are denied.**

<u>**PARTIES**</u>

3.      Plaintiff Jeremy McKnight ('Mr. McKnight') is an individual resident citizen of Pleasant Prairie, Wisconsin, and over the age of nineteen (19). He is a licensed commercial truck driver who was an "owner" who previously leased his truck and services to drive for CRST Transportation from its Birmingham, Alabama, location.

**ANSWER: Admitted.**

4.      CRST Transportation is an Iowa corporation which operates from a facility and principal place of business in Birmingham, Alabama, with offices situated in Vestavia Hills, Alabama. CRST Transportation is a federally-regulated motor carrier that provides transportation of property in interstate commerce under authority granted by the U.S. Department of Transportation ("DOT"). During all times material to this case, CRST Transportation is and has been an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

**ANSWER: Defendants admit that CRST Expedited, Inc. (referred to in Plaintiff's Amended and Restated Complaint as "CRST Transportation") is an Iowa corporation, which operates a facility in Birmingham, Alabama. Defendants further admit CRST Expedited is a motor carrier transporting property in interstate commerce, which operates under the authority of the U.S. DOT. Defendants deny the remaining**

allegations in Paragraph 4 to the extent it calls for a conclusion of law and no response is required.

5.      CRST Lincoln Sales, Inc. (hereinafter "CRST Lincoln") is an Iowa corporation, registered in Alabama as a foreign corporation. At all times herein, CRST Lincoln conducted business in the State of Alabama and in this district at its Birmingham and Vestavia Hills, Alabama, locations. CRST Lincoln acted as CRST Transportation's credit lender and leasing company to its CRST Transportation lease purchase owner-operators "owner" drivers such as Mr. McKnight at its operation located in Birmingham, Alabama.

**ANSWER: Defendants admit that CRST Lincoln Sales is an Iowa corporation, registered to do business in Alabama and conducting business in Alabama. Defendants further admit CRST Lincoln Sales leases equipment to lease-purchase and owner-operator independent contractor drivers, such as Plaintiff. Defendants deny the remaining allegations in Paragraph 5.**

6.      As a credit lender and leasing company, CRST Lincoln also provided financing for lease purchase contracts with CRST Transportation's independent contractors in conjunction with their hiring by CRST Transportation.  The two Defendants are interconnected, share the same locations and officers. As a result of their operation, CRST Lincoln and CRST Transportation operate as a motor carrier while simultaneously acting as an equipment leasing company whose agreements with Mr. McKnight are subject to the Federal Truth-In-Leasing Regulations.

**ANSWER: Defendants admit that CRST Lincoln Sales provided financing for lease-purchase contracts to independent contractor drivers. Defendants admit that CRST**

**Expedited, Inc. and CRST Lincoln Sales, Inc. share common ownership and locations. Defendants deny the remaining allegations in Paragraph 6 to the extent it calls for a conclusion of law and no response is required.**

7.      CRST Transportation and CRST Lincoln engaged in a course of conduct, and in concert, whereby these parties acted as part of a single common enterprise which violates federal and state law as described in the following paragraphs of this Complaint.

**ANSWER: Denied.**

## INTRODUCTION AND OVERVIEW OF
## THE FEDERAL REGULATORY SETTING

8.      As a regulated motor carrier, CRST Transportation primarily engages in providing transportation services to the shipping public using tractor-trailers under authority granted by the United States Department of Transportation (DOT).  CRST Transportation conducts its carrier service by hiring truckers such as Mr. McKnight who operated as a driver for CRST Transportation under its Independent Contractor Operating Agreement (ICOA) and by a Lease-Purchase Agreement (LPA) with CRST Lincoln.

**ANSWER: Defendants admit that CRST Expedited is a motor carrier transporting property, which operates under the authority of the U.S. DOT. Defendants further admit that CRST Expedited utilizes the services of independent contractor drivers, such as Plaintiff. Defendants deny the remaining allegations in Paragraph 8.**

9.      Under federal law and regulations, "authorized motor carriers" such as CRST Transportation may perform authorized transportation in equipment they do not own only if the equipment is covered by a written lease meeting the requirements set forth in Section 49 Code of Federal Regulations, Part 376, Section 367.12 and corresponding sections.  See 49 C.F.R. § 376.11 (a) *et seq.*  Section 376.12 requires authorized motor carriers such as CRST

Transportation and its leasing affiliate CRST Lincoln to include, and adhere to, specifically prescribed lease terms in owner- operator and lease-purchase agreements (also known as contractor agreements and standard leases).

**ANSWER: Paragraph 9 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

10.     Violations of the federal regulations are privately actionable under 49 U.S.C. § 14704(a)(l) and (2).  Those regulations are authorized pursuant to 49 U.S.C. §§ 13501, 14102 and 14704(a)(l) and (2), and include 49 C.F.R. § 376, *et seq.* Accordingly, this action includes claims brought pursuant to federal law regulating commerce including the activities of CRST Transportation and CRST Lincoln who are engaged in the transportation of property in interstate commerce through lease- purchase vehicles owned and operated by drivers CRST Transportation hires.

**ANSWER: Paragraph 10 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

11.     Mr. McKnight, as a condition of his employment, entered into (1) an Independent Carrier Operator Agreement (ICOA) with CRST Transportation on April 6, 2022 and (2) a Lease Purchase Agreement (LPA) with CRST Lincoln on April 7, 2022. Copies of the ICOA and LPA are attached hereto as Exhibit A and Exhibit B.

**ANSWER: Defendants admit Plaintiff entered into an Independent Carrier Operator Agreement (ICOA) on April 6, 2022 and a Lease Purchase Agreement (LPA) on April 7, 2022 and that those agreements were attached to the Complaint. Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

12.     Under these agreements, Mr. McKnight was both a Lease Purchase Owner and Operator and a Lessor.

**ANSWER: In answer to Paragraph 12, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

13.     With possession of his truck under the CRST Lincoln LPA, Mr. McKnight then hired his truck driving services and vehicle back to CRST Transportation under the ICOA. As alleged below, the interrelation between the terms of the Lease Purchase Agreement and ICOA and Defendants' policies and practices concerning the same violate federal leasing laws.

**ANSWER: In answer to Paragraph 13, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements. Defendants deny the remaining allegations in Paragraph 13.**

14.     As a lender and motor carrier who enters into lease purchase contractors with contractors who desire to purchase Defendants' LPA Vehicles, Defendants have an obligation to properly represent and convey correct and truthful details concerning each vehicle leased. Lease purchase drivers may bring a civil action to enforce his or her claim under The Odometer Act for Defendants defrauding plaintiffs of the actual odometer miles of each LPA Vehicle.

**ANSWER: Paragraph 14 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

15.     CRST Lincoln's and CRST Transportation's violations of federal leasing regulations injured Mr. McKnight. Mr. McKnight brings this action against Defendants

seeking injunctive relief and monetary damages pursuant to 49 U.S.C. § 14704(a)(l) and (2), as well as attorneys' fees and costs as authorized by 49 U.S.C. § 14704(e) and 49 U.S.C.§32710(b).  His complaint also states claims under state law.

**ANSWER: Defendants admit Plaintiff asserts claims seeking injunctive relief and monetary damages under 49 U.S.C. § 14704(a)(l) and (2) and attorneys' fees and costs under 49 U.S.C. § 14704(e) and 49 U.S.C.§ 32710(b) as well as claims under state law. Defendants deny Plaintiff's claims and deny Plaintiff is entitled to the damages sought.**

## FACTS

16.    Mr. McKnight earns his living as a commercial truck driver.

**ANSWER: Denied for lack of knowledge or information.**

17.    In March 2022 - April 6, 2022, Mr. McKnight attended CRST Transportation's driver orientation school located in Birmingham, Alabama.

**ANSWER: Admitted.**

18.    Based on the representations made by CRST Transportation's representatives during his schooling, Mr. McKnight agreed to become a lease-purchase owner-operator with CRST Transportation and its lending arm, CRST Lincoln.

**ANSWER: Denied for lack of knowledge or information.**

19.    From April 7, 2022 through on or about February 5, 2023, Mr. McKnight worked for CRST Transportation and CRST Lincoln as a lease-purchase "owner"- operator based out of CRST Transportation's Birmingham, Alabama, flatbed operations facility.

**ANSWER: Defendants admit Plaintiff performed work as an independent contractor owner-operator for CRST Expedited from April 7, 2022 to February 5, 2023 based out of its Birmingham, Alabama flatbed facility. Defendants deny the remaining**

**allegations of Paragraph 19.**

20.     As a regulated motor carrier, CRST Transportation primarily engages in providing transportation services to the shipping public under authority granted by the DOT. At all relevant times, Mr. McKnight worked for CRST Transportation's flatbed division which was based out of Birmingham, Alabama under authority granted by DOT.

**ANSWER: Defendants admit that CRST Expedited is a motor carrier transporting property, which operates under the authority of the U.S. DOT. Defendants further admit that Plaintiff worked for its flatbed division and was based out of its Birmingham, Alabama facility. Defendants deny the remaining allegations in Paragraph 20.**

21.     In order to be hired as a commercial truck driver for CRST Transportation, Mr. McKnight had to both (1) acquire a vehicle through its lease purchase agreement (LPA - Exhibit A) with CRST Lincoln as the leasing company, and (2) enter into an Independent Carrier Operating Agreement (hereinafter "ICOA" - Exhibit B) with CRST Transportation as the motor carrier. McKnight signed CRST Transportation's ICOA on April 6, 2022 at Defendants' Birmingham facility.

**ANSWER: Defendants admit Plaintiff signed the ICOA on April 6, 2022 at its Birmingham facility. Defendants deny the remaining allegations in Paragraph 21.**

22.     Mr. McKnight was set to sign his LPA with CRST Lincoln in Birmingham, Alabama, during the same day. However, the vehicle CRST Lincoln and CRST Transportation selected for Mr. McKnight was not available. As a result, Defendants required Mr. McKnight to drive to pick up a different LPA Vehicle they selected for him which was located at their facility in Iowa.

**ANSWER: Defendants admit the first vehicle was not available in Birmingham on April 6, 2022 so Plaintiff picked up a different vehicle from Defendants' facility in Iowa. Defendants deny the remaining allegations in Paragraph 22.**

23.     On April 7, 2022, Mr. McKnight signed a lease-purchase agreement (hereinafter "LPA") with CRST Lincoln at Defendant's Iowa location. Under that agreement, he leased-to-own from CRST Lincoln a 2020 Freightliner Cascadia, VIN Number: 3AKJHHDR9LSLP7298 ("LPA vehicle"), unit number 104198. The LPA had a 217-week contract term and contained a purchase option which gave Mr. McKnight the right to purchase the subject vehicle during the term or at the end of the 217-week term (Exhibit B, p. 2 and "Schedule A").

**ANSWER: Defendants admit Plaintiff signed the LPA on April 7, 2022 at its Cedar Rapids, Iowa location. In answer to the remaining allegations in Paragraph 23, Defendants state that the LPA speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

24.     The LPA and ICOA agreements are interrelated and contingent on each other essentially operating as one agreement, all of which originated from the same controlling parties. For instance, the LPA with CRST Lincoln purportedly gives rights to CRST Transportation to collect the CRST Lincoln lease payments from McKnight's earnings with CRST Transportation and also provides that CRST Lincoln's LPA terminates when CRST Transportation's ICOA terminates.

**ANSWER: In answer to Paragraph 24, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

25. CRST Transportation and CRST Lincoln designated which LPA Vehicle Mr. McKnight received to lease/purchase. Neither CRST Transportation nor CRST Lincoln allowed Mr. McKnight to review the logs and/or inspect the vehicle to which he was assigned for the LPA.

**ANSWER: Denied.**

26. In order for Mr. McKnight to become CRST Transportation's and CRST Lincoln's lease-purchase owner-operator driver, Defendants required Mr. McKnight to accept the LPA vehicle "as is" or not accept it at all.

**ANSWER: Defendants admit Plaintiff signed a certificate of acceptance as part of the LPA stating that he accepted the equipment "as is." Defendants deny the remaining allegations in Paragraph 26.**

27. When Mr. McKnight received his LPA Vehicle from CRST Lincoln and CRST Transportation on April 7, 2022, the odometer stated the LPA Vehicle had 19,303 miles prior to McKnight signing the LPA. At all times prior to signing the LPA, Defendants represented to Mr. McKnight that he was receiving a very low mileage truck.

**ANSWER: Denied.**

28. Mr. McKnight relied on Defendants' representations about the vehicle's condition and he executed the LPA in return.

**ANSWER: Denied.**

29. McKnight's LPA Vehicle was first serviced in June 2022 and during this service the vehicle's computer was scanned. Once the scanning was complete, the odometer rollback was correct and the LPA Vehicle's odometer stated 305,209 miles.

**ANSWER: Denied for lack of knowledge or information.**

30. At all times prior to receiving his LPA Vehicle and signing his LPA with CRST Lincoln, Defendants assured Mr. McKnight he was receiving a lightly used LPA Vehicle with low miles and they assured him it was in great condition. Despite such assurances, Defendants never provided any government disclosures or logs concerning the vehicle's history, condition, or mileage before they assigned the LPA Vehicle to Mr. McKnight.

**ANSWER: Denied.**

31. Mr. McKnight was so excited about receiving a low mileage vehicle that he took a picture of the vehicle's odometer when he took possession on April 7, 2022.

**ANSWER: Denied for lack of knowledge or information.**

32. On June 1, 2022, Mr. McKnight took his LPA Vehicle in for preventative and routine maintenance service. During this service, the mechanics checked the vehicle and its electronic control unit (ECU) and modules (ECM). After reading the LPA Vehicle's codes, the vehicle's actual mileage of 305,209 was immediately displayed on the vehicle's odometer.

**ANSWER: Denied for lack of knowledge or information.**

33. At the time the LPA was signed, CRST Transportation and CRST Lincoln required Mr. McKnight to sign many documents, but they did not permit Mr. McKnight to review the logs of the LPA Vehicle he was provided, despite his request. The transfer forms for the LPA were not the official, secured forms as required by the Odometer Act, see 49 C.F.R. § 580.4 (2000), and did not contain certain mandatory disclosures. Instead, Defendants showed McKnight the LPA Vehicle's mileage and bragged about how he was receiving such a low mileage LPA Vehicle.

**ANSWER: Defendants admit Plaintiff signed multiple documents at the time the**

**LPA was signed. Defendants deny the remaining allegations in Paragraph 33.**

34.     Defendants used their own forms and devices to conceal what the odometer reading would have revealed. Mr. McKnight would not have accepted the terms of the LPA, the LPA Vehicle, or taken possession of such a high mileage LPA Vehicle had he known its actual mileage.

**ANSWER: Denied.**

35.     Defendants defrauded, misrepresented, and intentionally concealed the vehicle's actual mileage in order to induce Mr. McKnight's performance and acceptance of the LPA Vehicle.

**ANSWER: Denied.**

36.     CRST Lincoln and CRST Transportation intended to defraud Mr. McKnight in violation of the Odometer Act because they rolled back the miles on the odometer prior to executing the LPA contract with Mr. McKnight and prior to assigning him the LPA Vehicle.

**ANSWER: Denied.**

37.     As part of the LPA's requirements, CRST Lincoln, in addition to the lease, required Mr. McKnight to sign an "Authorization and Assignment." The Authorization and Assignment directs "Carrier," which is shown as CRST Transportation, to pay itself lease payments and other funds by deducting those from McKnight's earnings under his ICOA with CRST Transportation.

**ANSWER: In answer to Paragraph 37, Defendants state that the LPA speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

38.     The LPA between CRST Lincoln and Mr. McKnight provided that all monies

needed for the lease security deposit, escrow maintenance account, general escrow account, performance bond, securement, and weekly vehicle lease payments would be held and collected by CRST Transportation by deducting those from Mr. McKnight's pay settlements which he earned as a driver for CRST Transportation and which CRST Transportation calculated.

**ANSWER: In answer to Paragraph 38, Defendants state that the LPA speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

39.     Under the ICOA and LPA, Mr. McKnight was the "owner" of LPA vehicle equipment within the meaning of 49 C.F.R. § 376.2(d), and a "lessor" of LPA motor vehicle equipment back to CRST Transportation within the meaning of 49 C.F.R. § 376.2(f).

**ANSWER: In answer to Paragraph 39, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

40.     Mr. McKnight's ICOA with CRST Transportation provides that he would be paid seventy-five percent (75%) of Adjusted Gross Revenue (hereinafter "AGR") as billed by CRST Transportation for the shipment.  The ICOA requires CRST Transportation to electronically post his settlement statements showing the revenue and deductions and charge backs based on actual costs. (Exhibit B, § 3.1-5.1). Freight bills are the actual bills to CRST Transportation's customer and are also required to be provided to McKnight under the regulations of Truth in Leasing.

**ANSWER: In answer to Paragraph 40, Defendants state that the ICOA speaks for itself and deny any allegation or characterization outside the terms of said agreement. Defendants further deny the last sentence of Paragraph 40 to the extent it calls for a**

**conclusion of law and no response is required.**

41.     Defendants also told Mr. McKnight he would receive incentive pay for the hauls he transported for CRST Transportation's customers.

**ANSWER: Defendants are without sufficient information to admit or deny the allegations of paragraph 41.**

42.     Mr. McKnight requested settlement statements and freight bills from CRST Transportation throughout his tenure as its driver, but none were ever provided nor has he received any detailed accounting concerning how his pay was adjusted.

**ANSWER: Denied.**

43.     Throughout his employment, Mr. McKnight never received a detailed accounting or any cost/vendor/customer payment documentation from Defendants which showed how the line haul percentages were determined or how his pay was adjusted based on the actual costs incurred by each Defendant.

**ANSWER: Denied.**

44.     The ICOA includes the following definitions:

> 1(A)(2)(a). Gross Revenue shall mean all revenue - billed by Carrier to shippers, consignees, brokers, logistics companies, freight forwarders, other carriers, or other customers (referred to together as "Carrier's Customer" throughout this Agreement) in connection with shipments Contractor hauls under this Agreement - for pickup and delivery charges, mileage charges, linehaul transportation charges, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges.

**ANSWER: In answer to Paragraph 44, Defendants state that the ICOA speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

45.     To calculate AGR, CRST Transportation is supposed to start with the Gross Revenue for a particular shipment and reduce it by the following:

1(A)(2)(b). Adjusted Gross Revenue ("AGR") shall mean Gross Revenue for a particular shipment, reduced by any and all:

1(A)(2)(b)(1). Incentive, discount, fee (including for loading or unloading services provided by Carrier's Customer either directly or through a Third Party), or commission Carrier gives Carrier's Customer with respect to the shipment;

1(A)(2)(b)(2). All amounts Carrier paid to third parties, including but not limited to Carrier's Customer or an affiliate of Carrier, (together, "Third Parties") in relation to movement of the shipment if not covered by a charge separately stated on Carrier's invoice to Carrier's Customer, including, but not limited to, fees or commissions (including commission recoveries), paid to brokers, freight forwarders, interline , or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other Third Party, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits, loading and/or unloading (including lumper) services, freight payment-processing fees (consisting of the actual cost incurred by Carrier for the shipment if Carrier's customer or an outside payer makes deductions from Carrier's freight charges related to electronically-transmitted billing and payment account use), amounts paid or accrued for cartage, certain specialized trailers and excessive trailer spotting, tarping, or special security measures paid to a Third Party or to Contractor; and amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment; and

1(A)(2)(b)(3). Charges separately stated on Carrier's invoice to Carrier's Customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), detention charges actually received from the shipper, loading and unloading (including lumper) charges, "truck ordered but not used" charges, insurance surcharges, escort service charges, tolls, over-dimensional and other permits, trailer charges, cartage charges, spotting charges, freight payment processing fees, excess-value charges or high-value freight charges, surcharges for special security measures, charges for Third-Party contract services, charges for the international portion of loads going to or coming from Mexico, and charges for other services Carrier obtained from a broker, freight forwarder, interline or augmenting carrier, warehouse or other storage provider, terminal, agent, other independent contractor, or other third party.

**ANSWER: In answer to Paragraph 45, Defendants state that the ICOA speaks for itself and deny any allegation or characterization outside the terms of said agreement.**

46.     The ICOA and LPA designated that $.15 would be deducted from Mr. McKnight's pay settlements and deposited in their "Additional Rent/Maintenance and Other

Reserve Fund" account for purposes of funding the all-inclusive "Comprehensive Maintenance Furnished by Lessor (CRST Lincoln" which Defendants advertised and promised Mr. McKnight would receive while he operated his LPA Vehicle. Mr. McKnight learned after executing both documents that he was paying extra money at the rate of $.15 per mile for a program that did not exist.

**ANSWER: In answer to Paragraph 39, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

47.     CRST Lincoln previously labeled the maintenance program additional rent account an escrow account but changed the name to additional rent after being sued for confiscating driver's escrowed funds of the LPA Vehicles when CRST Lincoln repossessed the same. At all relevant times, Defendants changed and/or manipulated the times it would pay driver settlements in order for drivers such as Mr. McKnight to accrue additional expenses prior to hauling the next load. By manipulating the payments, Defendants prevented McKnight and other drivers from getting ahead financially.

**ANSWER: Denied.**

48.     Mr. McKnight was told the additional payments were to cover any maintenance expense he needed or requested, but in actuality, the funds were taken and kept by Defendants.

**ANSWER: Denied.**

49.     Under the ICOA and LPA, $2,000.00 was required to be funded for a "General Escrow Fund" which CRST Transportation also held and controlled. To fund this CRST Transportation deducted $25.00 per week from McKnight's weekly compensation.

(Exhibit A, App. A, p. A-10) This escrow account was held, managed, and controlled by CRST Transportation.

**ANSWER: In answer to Paragraph 49, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

50.     The ICOA and LPA also required Mr. McKnight to fund a "Maintenance and Other" reserve fund in addition to the comprehensive maintenance plan Defendants forced him to pay for which he never received benefit. This escrow account was held, managed, and controlled by CRST Transportation.

**ANSWER: In answer to Paragraph 50, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

51.     Defendants required Mr. McKnight to fund an additional tax/title/permit escrow account at the rate of $179.83 per month and/or week. This escrow account was held, managed, and controlled by CRST Transportation.

**ANSWER: In answer to Paragraph 51, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

52.     Per the LPA and ICOA, CRST Transportation and CRST Lincoln controlled where Mr. McKnight serviced and/or repaired the subject vehicle, as well as what maintenance services were done. Mr. McKnight intended to use his LPA vehicle for a very long time and he requested periodic maintenance be performed on his vehicle, but Defendants declined many of his requests even though McKnight was paying weekly for a comprehensive

vehicle maintenance program funded by the "additional rent" charges Defendants deducted from his compensation.

**ANSWER: In answer to the first sentence of Paragraph 52, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements. Defendants deny the remaining allegations in Paragraph 52 for lack of knowledge or information.**

53. At all times, CRST Transportation and CRST Lincoln decided what services could be done, what constituted comprehensive maintenance, when services could be performed, and the amount they were willing to pay. Mr. McKnight was paying thousands of dollars monthly for Defendants' comprehensive maintenance program, but he was never allowed to receive comprehensive maintenance.

**ANSWER: Denied.**

54. Neither CRST Transportation nor CRST Lincoln are licensed to sell insurance. Despite this, CRST Transportation forced-placed multiple insurance products on Mr. McKnight while setting the premium amounts for each product they deducted from Mr. McKnight's weekly compensation.

**ANSWER: Defendants admit they are not licensed to sell insurance. Defendants deny the remaining allegations in Paragraph 54.**

55. Even though CRST Transportation deemed Mr. McKnight an independent contractor, they required him to purchase occupational accident insurance through their approved entity totaling $1,953.00 plus administrative fees paid to CRST Transportation. The premium amount and the designated administrative fee for this product was set by CRST Transportation and CRST Lincoln.

**ANSWER: Defendants admit Plaintiff was an independent contractor. Defendants deny the remaining allegations in Paragraph 55.**

56.    CRST Lincoln and CRST Transportation required Mr. McKnight to purchase Physical Damage Insurance from their sister company, Great Plains Casualty, Inc. The premium amount and the designated administrative fee for this product was set by CRST Transportation and CRST Lincoln at the rate of $4,687.76 ($90.14 per week) which included a .5% markup charged by CRST Transportation for offering this forced service. Upon information and belief, the monies deducted from his income exceeded the premium for any coverage actually provided for McKnight and was in reality a revenue source CRST Transportation.

**ANSWER: Denied.**

57.    CRST Lincoln and CRST Transportation required Mr. McKnight to purchase UM/UIM coverage from their sister company, Great Plains Casualty, Inc. The premium amount and the designated administrative fee for this product was set by CRST Transportation and CRST Lincoln. Upon information and belief, the amount deducted from his income exceeded the premium for any coverage actually provided for McKnight and was in reality a revenue source CRST Transportation.

**ANSWER: Denied.**

58.    CRST Lincoln and CRST Transportation LPA required Mr. McKnight to purchase Non-Trucking Liability Insurance from their sister company, Great Plains Casualty, Inc. The premium amount and the designated administrative fee for this product was set by CRST Transportation and CRST Lincoln at the rate of $38.00 per month until the $348.00 yearly premium was paid plus Defendants' markup. Mr. McKnight was routinely

overcharged the state amount. Upon information and belief, the amount deducted from his income exceeded the premium for any coverage actually provided for McKnight and was in reality a revenue source CRST Transportation.

**ANSWER: Denied.**

59.     CRST Transportation required Mr. McKnight to purchase $3,722.13 equipment such that it charged him at least $75.00 per week.

**ANSWER: Defendants admit Plaintiff was charged for equipment pursuant to his agreements under the ICOA and LPA. Defendants deny the remaining allegations in Paragraph 59.**

60.     CRST made weekly charge backs and deductions from Mr. McKnight's compensation based on the values they assigned which include but were not limited to the following: road use tax deduction, license and permit deduction, fuel tax deduction, tarps/chains/binders deduction, trailer rent, network charges, electronic log charges, device rentals, pegasus scanning.

**ANSWER: Defendants admit deductions and chargebacks were made on Plaintiff's compensation pursuant to his agreements under the ICOA and LPA. Defendants deny the remaining allegations in Paragraph 60.**

61.     Throughout his employment, Mr. McKnight never received a detailed accounting concerning how the line haul percentages were determined or how his pay was adjusted.

**ANSWER: Denied.**

62.     CRST Transportation and CRST Lincoln have a pattern and practice of refusing to provide rate freight bills or the documentation their LPA drivers like Mr.

McKnight needed to verify they were accurately being paid.

**ANSWER: Denied.**

63. Upon information and belief, CRST Lincoln and CRST Transportation refused to provide such documentation in order to pay their drivers like Mr. McKnight less and to overcharge Mr. McKnight more of the deductions and charge backs each made against his compensation.

**ANSWER: Denied.**

64. On at least one occasion, CRST Transportation reported they received less money from a customer in order to pay Mr. McKnight a lower line haul percentage than what CRST Transportation's freight bills showed was actually received by Defendants.

**ANSWER: Denied.**

65. At all relevant times, CRST Transportation and CRST Lincoln had a pattern and practice of unlawfully reducing the compensation Mr. McKnight was owed.

**ANSWER: Denied.**

66. CRST Transportation and CRST Lincoln also controlled Mr. McKnight's possession and use of the vehicle. Mr. McKnight was forbidden to freely use his lease purchase vehicle to haul loads from other motor carriers. CRST Transportation and CRST Lincoln required Mr. McKnight to only haul loads assigned to McKnight through CRST Transportation's dispatch and driver manager.

**ANSWER: Denied.**

67. Mr. McKnight routinely paid his lease-purchase payments and funded the deductions required under the LPA and ICOA and he was never in default under the terms of the ICOA or LPA.

**ANSWER: Admitted.**

68.     In December 2022 - February 2023, CRST Transportation started changing the how and when it paid its LPA Drivers, including Mr. McKnight.

**ANSWER: Denied.**

69.     Mr. McKnight was continuously running loads for Defendants but due to how Defendants' prolonged payments owed to him, Mr. McKnight started losing money and he complained to CRST Transportation, but nothing was done.

**ANSWER: Denied.**

70.     By the end of February 2023, Mr. McKnight had paid over $19,530.00 in lease purchase payments to CRST Transportation and CRST Lincoln over the course of 42 weekly payments.

**ANSWER: Denied.**

71.     On February 5, 2022, McKnight turned in his truck because CRST Transportation had reduced payment for the loads he was required to haul, reduced McKnight's compensation by skimming his pay for loads hauled, reduced his pay due to unlawful chargebacks and deductions, and Defendants routinely failed to pay McKnight timely or pay him the full incentive pay.

**ANSWER: Defendants admit Plaintiff turned in his truck on February 5, 2023. Defendants deny the remaining allegations in Paragraph 71.**

72.     Prior to relinquishing his LPA Vehicle, Mr. McKnight traveled to Defendants' Iowa hub and complained about these issues, but Defendants refused to address any of them.

**ANSWER: Denied.**

73.     At the same time, Defendants refused to allow Mr. McKnight the right to use his LPA vehicle to haul loads for other motor carriers.

**ANSWER: Denied.**

74.     As a result, McKnight was forced to turn the subject vehicle because he was unable to make a living due to CRST Transportation's and CRST Lincoln's unlawful constraints and payment practices.

**ANSWER: Denied.**

75.     After turning in his LPA Vehicle, McKnight continued to call CRST Transportation with requests for payments concerning all of his escrowed funds and his final paycheck. Defendants ignored Mr. McKnight's requests.

**ANSWER: Denied.**

76.     When Mr. McKnight relinquished his LPA Vehicle, it was DOT compliant.

**ANSWER: Denied for lack of knowledge or information.**

77.     Nonetheless, CRST Transportation and CRST Lincoln charged Mr. McKnight for another DOT inspection, comprehensive maintenance, and nefarious items in order to confiscate and convert all of Mr. McKnight's funds escrowed with CRST Transportation and his final check. The subject vehicle did not require any preventative maintenance.

**ANSWER: Denied.**

78.     After Defendants took possession of the LPA Vehicle and terminated its agreements on February 7, 2022, CRST Lincoln and CRST Transportation continued to charge Mr. McKnight for bobtail insurance, health insurance, occ acc insurance, FBS Health Insurance I/C, an annual inspection for the vehicle, licensing charges, physical

damage insurance, admin fees, and bond deductions for a truck McKnight no longer possessed.

**ANSWER: Defendants admit Plaintiff was charged for items pursuant to his agreements under the ICOA and LPA. Defendants deny the remaining allegations in Paragraph 78.**

79.     Despite taking possession of the truck on February 5, 2023, CRST Lincoln and CRST Transportation continued to charge Mr. McKnight for standard deduction for months following his termination and they made insurance claims against his former LPA Vehicle's policy well into April 2023.

**ANSWER: Defendants admit Plaintiff was charged for items pursuant to his agreements under the ICOA and LPA. Defendants deny the remaining allegations in Paragraph 79.**

80.     CRST Transportation and CRST Lincoln also refused to return McKnight his accumulated escrow funds, interest payments, tax/title/toll escrow, or his bond monies.

**ANSWER: Defendants admit no funds were returned to Plaintiff. Defendants deny Plaintiff was entitled to the return of any funds and deny the remaining allegations in Paragraph 80.**

81.     Prior to filing this action, Mr. McKnight called Defendants and demanded the return of his escrowed funds as well as his final payment. CRST Transportation told McKnight he was not entitled to anything.

**ANSWER: Admitted.**

82.     CRST Transportation took McKnight's money, final paycheck, securement, escrowed funds, vehicle equity, and property. Instead of returning the funds within forty-five

(45) days, CRST Transportation and CRST Lincoln spent Mr. McKnight's escrow funds on deductions it taxed against Mr. McKnight once it took physical possession of McKnight's LPA vehicle in February 2023.

**ANSWER: Defendants admit deductions were made from Plaintiff's pay pursuant to his agreements under the ICOA and LPA. Defendants deny the remaining allegations in Paragraph 82.**

83.     When CRST Transportation took possession of Mr. McKnight's lease-purchase subject vehicle, Mr. McKnight had approximately $2,000.00 in his "Performance Bond/General Escrow" account, $5,463.52 in his toll/tax/license/permit escrow, and paid over $12,082.20 in the "comprehensive maintenance program," and hundreds into his Maintenance Escrow Reserve Fund" escrow fund account.

**ANSWER: Denied.**

84.     CRST Transportation also refused to pay Mr. McKnight's final paycheck totaling $3,560.87 before deductions.

**ANSWER: Defendants admit deductions were made from Plaintiff's final paycheck pursuant to his agreements under the ICOA and LPA resulting in no net pay to Plaintiff. Defendants deny the remaining allegations in Paragraph 84.**

85.     To date, none of the funds Mr. McKnight entrusted to CRST Transportation have been returned.

**ANSWER: Defendants admit no funds were returned to Plaintiff. Defendants deny Plaintiff was entitled to the return of any funds and deny the remaining allegations in Paragraph 85.**

86.     Despite his multiple requests, CRST Transportation or CRST Lincoln have

not provided McKnight an accounting for the funds and assets of his that they received and/or took nor have his funds and property been returned to him.

**ANSWER: Denied.**

87.     CRST Lincoln's and CRST Transportation's actions plead above made it impossible for Mr. McKnight to perform per the terms of the ICOA and the LPA.

**ANSWER: Denied.**

88.     As a result of CRST Transportation's and CRST Lincoln's termination and confiscation of funds, Mr. McKnight lost his transportation business and his ability to provide for himself and his family.

**ANSWER: Denied.**

89.     A full and final accounting from CRST Transportation and CRST Lincoln setting forth any deductions from his escrow funds was never provided to Mr. McKnight.

**ANSWER: Denied.**

90.     As a result of CRST Transportation's and CRST Lincoln's actions and inaction, Mr. McKnight has been and continues to be damaged.

**ANSWER: Denied.**

**COUNT I**
**VIOLATION OF FEDERAL TRUTH IN LEASING**
**49 U.S.C. S § 14704(a)(2) and 49 C.F.R. §§ 376.12 et. seq.**

Plaintiff realleges and incorporates the facts alleged in the previous paragraphs1-90 and makes them a part hereof.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

91.     Title 49 U.S.C. Section 14704(a)(2) creates a right of action for damages arising

from authorized carrier's violation of the Motor Carrier Act and the Federal Truth in Leasing regulations.

**ANSWER: Paragraph 91 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

92.     CRST Transportation entered into an ICOA with Mr. McKnight to hire his services and equipment that CRST Transportation did not own. The ICOA with CRST Transportation and LPA agreement with CRST Lincoln included many required provisions mandated by 49 C.F.R. § 376.12.

**ANSWER: In answer to Paragraph 92, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements. Defendants deny the remaining allegations in Paragraph 92 to the extent it calls for a conclusion of law and no response is required.**

93.     CRST Transportation, as an "authorized carrier," entered into an LPA and ICOA with Mr. McKnight as an "owner" to hire his services and equipment.

**ANSWER: In answer to Paragraph 93, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

94.     Under federal law, an "authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: . .. [t]here shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12."

**ANSWER: Paragraph 94 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

95.     CRST Transportation engaged in the unlawful provision of transportation services in equipment it does not own because it failed to conform to provisions required by 49 C.F.R. Part 376 and included in the ICOA and LPA which governing its use of Mr. McKnight's equipment and services.

**ANSWER: Denied.**

96.     At all relevant times, CRST Lincoln assigned its rights under the LPA to its sister company, CRST Transportation.

**ANSWER: Denied.**

97.     CRST Transportation failed to abide by multiple requirements within its LPA and ICOA and which were mandated by statute under the applicable regulations, to wit:

A.     49 C.F.R. § 376.12(I) requires that the LPA and ICOA standard lease specify the terms of any agreement in which an owner-operator purchases or rents equipment which gives the carrier the right to make deductions from compensation for the purchase or rental payments. As the lender CRST Lincoln, the LPA assigned and authorized such rights to CRST Transportation as Lessor. CRST Transportation deducted the weekly installment payments and fees for such agreements from the compensation of Mr. McKnight but has failed to account for those.

B.     49 C.F.R. § 376.12(h) requires that the LPA and ICOA standard lease to "clearly specify all items that may be initially paid for by the authorized carrier, but deducted from the lessor's compensation . . . together with a recitation as to how the amount of each item is to be computed." Additionally, the regulation mandates that the owner- operator "shall be afforded copies of those documents which are necessary to determine the "va1idity of the charge." CRST Transportation and CRST Lincoln deducted numerous charges from pay settlements of Mr. McKnight but failed to provide him documents from which he could check the validity of the charges or documentation showing the actual cost incurred by Defendants for each charge. Defendant failed to provide documentation to support its markups or administrative fees. Those include charges for occupation insurance and insurance products together with an administrative fee that provides no coverage to McKnight, as well as insurance premiums on the truck with no documentation to validate the charges.

C.     49 C.F.R. § 376.2(k)(4) requires that the ICOA specify that the owner-operator has the right to demand an accounting at any time for transactions involving escrow funds that the carrier controls. CRST Transportation failed to provide an accounting despite the regulation requirements included in the LPA and

ICOA.  Not only has there been no accounting for these funds, when CRST Transportation improperly terminated its agreements, it kept the balance of both McKnight's maintenance plan account payments and general escrow account which collectively total at least $12,082.20.

D.      49 C.F.R. § 376. 12(k)(5) requires the lease to specify that the motor carrier shall pay the owner-operator interest on escrow funds the carrier controls on at least a quarterly basis, and must calculate the interest pursuant to a prescribed method. CRST Transportation while consistently collecting these escrow funds failed to pay interest on all bonds, deposits, and escrow funds or to account for those despite the regulation requirements included in the LPA and ICOA.

E.      49 C.F. R. § 376. l2(k)(6) requires the lease to specify that at the time of return of escrow funds; the carrier may make deductions from escrow funds for those obligations incurred by the owner-operator which have been previously specified in the lease. CRST Transportation failed to return Mr. McKnight's escrow funds despite the regulation requirements included in the LPA and ICOA.

F.      49 C.F.R. § 376. 1 2(k)(3) requires the lease to specify that the carrier will provide an accounting to the owner-operator of any transactions involving escrow funds under the carrier's control by either of two prescribed methods. CRST Transportation and CRST Lincoln failed to abide by this regulation included in the LPA and ICOA.

G.      49 C.F.R. § 376.12(h) requires the lease to "clearly specify all items that may be initially paid for by the authorized carrier, but deducted from the lessor's compensation . . . together with a recitation as to how the amount of each item is to be computed." Additionally, this regulation mandates that the Mr. McKnight as the lease purchase owner-operator "shall be afforded copies of those documents which are necessary to determine the validity of the charge." CRST Transportation and CRST Lincoln failed to abide by this regulation included in the LPA and ICOA while making numerous deductions from McKnight's earnings. In further violation of this regulation, CRST Lincoln and CRST Transportation forced placed insurance on Mr. McKnight whereby  Defendants set the premium amount and admin fee for each insurance product they forced Mr. McKnight to purchase from their affiliate and/or sister company Great Plains Casualty Insurance Co without a license to do so.

H.      49 C.F.R. § 376. 12(j)(3) requires the lease to specify that the authorized carrier will provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made.  CRST Transportation and CRST Lincoln failed to abide by this regulation which is also required by the LPA and ICOA.

I.      49 C.F.R. § 376.12(g) requires that "the lease must permit Mr. McKnight the ability to examine copies of the motor carrier's tariff and other documents upon which

its rates are calculated. Despite repeated requests, CRST Transportation and CRST Lincoln jointly and separately failed to provide freight bills and other documents upon which its rates are based and has failed to abide by this regulation which is also required by the LPA and ICOA. Doing so allowed CRST Transportation to unlawfully profit from the work Mr. McKnight performed from April 7, 2022-February 2023 because it manufactured its own internal documents called pay settlement statements which represented to Mr. McKnight that CRST Transportation was allegedly receiving less money from its customer than actual received.

J.　　CRST Lincoln and CRST Transportation unlawfully reduced McKnight's compensation for deducting additional rent for a lease purchase vehicle he was already paying a lease payment for. This is a violation of Truth in Leasing.

K.　　CRST Lincoln and CRST Transportation CRST Lincoln and CRST Transportation violated the motor carrier act and the truth in leasing regulations by charging Mr. McKnight additional rent for a comprehensive maintenance program for which McKnight never received the benefit of. This is a clear violation of the Act and regulations.

**ANSWER: Paragraph 97 and its subparts call for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

98.　　CRST Transportation agreed to pay Mr. McKnight, as an owner-operator, seventy-five percent (75%) of the Adjusted Gross Revenue, as defined, which it billed to the shipper. (ICOA§§ 3.2(i-iv)). Despite this, CRST Transportation failed to pay Mr. McKnight in accordance with this agreement during his April 7, 2022 - February 5, 2023 tenure.

**ANSWER: In answer to the first sentence of Paragraph 98, Defendants state that the ICOA speak for itself and deny any allegation or characterization outside the terms of said agreement. Defendants deny the remaining allegations in Paragraph 98.**

99.　　CRST Transportation did not pay Mr. McKnight for all incentives to which he was entitled while driving as CRST Transportation's lease-purchase owner-operator, nor did it pay McKnight his final paycheck totaling $3,560.87 before deductions. The unpaid incentives include, but are not limited to, fuel surcharges, tarp pay, load and unloading

incentives, retention, or waiting incentives.

**ANSWER: Denied.**

100.     CRST Transportation, upon information and belief, and in violation of its agreement and the truth-in-leasing regulations, reduced and understated the gross revenue it actually billed the shipper on Mr. McKnight's pay settlements before it calculated the compensation due to him as an operator.  By reporting to Mr. McKnight a reduced amount in adjusted gross revenue billed to the shipper, CRST Transportation underpaid him.

**ANSWER: Denied.**

101.     All deductions CRST Transportation and CRST Lincoln made from McKnight's compensation concerning costs, additional rent, maintenance, and use of McKnight's LPA vehicle after it took possession to release McKnight's LPA vehicle were unlawful and were made for the sole purpose of converting McKnight's funds in Defendants' possession.

**ANSWER: Denied.**

102.     CRST Transportation's ICOA and CRST Lincoln's standard lease agreement with McKnight also failed to comply with 49 C.F.R. § 376.12:

> 1.     ICOA and LPA did not disclose the amount deducted from Mr. McKnight's compensation that exceeds the actual cost of the items initially paid for by CRST Transportation or CRST Lincoln, and did not disclose how these deductions from compensation were calculated, all in violation of 49 C.F.R. §376.12 (h);
>
> 2.     The ICOA and LPA did not specify with particularity the items for which Mr. McKnight's escrow could be used, nor was its control of the funds limited as required by 49 C.F.R. § 376.12 (k).
>
> 3.     The LPA charged Mr. McKnight additional money for a comprehensive maintenance program and Defendants labeled this deduction "additional rent." However, Defendants declined Mr. McKnight's repeated maintenance and service requests for his LPA Vehicle from April 2022 through February 2023. However, once Defendants took possession of the LPA Vehicle in February 2023, Defendants quickly

charged Mr. McKnight for multiple maintenance line items in order to wipe out the funds Mr. McKnight had entrusted to Defendants during his employment.

**ANSWER: Paragraph 102 calls for a conclusion of law and no response is required. To the extent a response is required, Defendants state that the ICOA and LPA speak for themselves and deny any allegation or characterization outside the terms of said agreements.**

103. From April 6, 2022 through February 5, 2023, CRST Transportation and CRST Lincoln deducted at least 42 lease purchase payments of $465.00 per week, totaling $19,530.00. In addition to these payments, CRST Transportation also deducted from McKnight's compensation fees for device charges, securement purchase payments, auxiliary equipment purchase, occupational insurance, administrative fees, premiums for all insurance services CRST Transportation required McKnight to purchase, and other equipment rentals.

**ANSWER: Defendants admit deductions were made on Plaintiff's compensation pursuant to his agreements under the ICOA and LPA. Defendants deny the remaining allegations in Paragraph 103.**

104. From April 6, 2022 and continuing through April 2023, CRST Transportation and CRST Lincoln worked in concert to make repeated deductions from McKnight's compensation in violation of the regulations and agreements.

**ANSWER: Denied.**

105. Mr. McKnight performed all obligations required of him under the ICOA standard lease and the LPA.

**ANSWER: Denied.**

106. Throughout his work with CRST Transportation, Mr. McKnight asked for an

accounting from CRST Transportation, but an accounting for pay settlements calculations was never provided.

**ANSWER: Denied.**

107.     The federal leasing regulations provide that when a motor carrier like CRST Transportation and its lending arm CRST Lincoln require the escrowing of funds by a lease-purchase/owner-operator such as Mr. McKnight, then the motor carrier must provide an accounting to Mr. McKnight of the escrowed funds on a monthly basis and pay interest on all escrowed funds on a quarterly basis.  49 C.F.R. § 376.12(k). CRST Transportation failed to pay interest on all of McKnight's escrowed funds.

**ANSWER: The first sentence of Paragraph 107 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied. Defendants deny the remaining allegations in Paragraph 107.**

108.     CRST Transportation and CRST Lincoln violated their agreements with McKnight and the leasing regulations because they failed to provide Mr. McKnight a monthly accounting.

**ANSWER: Denied.**

109.     CRST Transportation did not abide by federal leasing regulations because it failed to pay interest quarterly on all of Mr. McKnight's escrowed deposits and it failed to return escrowed deposits at the termination of his lease.

**ANSWER: Denied.**

110.     As of the filing of this complaint, well over forty-five (45) days after the termination of Mr. McKnight's lease as allowed in the LPA, CRST Transportation has not returned any of Mr. McKnight's escrow fund monies to him or interest thereon as is required

under the regulations and its agreements with Mr. McKnight.

**ANSWER: Defendants admit no funds were returned to Plaintiff. Defendants deny Plaintiff was entitled to the return of any funds and deny the remaining allegations in Paragraph 110 to the extent it calls for a conclusion of law and no response is required.**

111. CRST Transportation also failed to pay Mr. McKnight his final paycheck totaling $3,560.87 before deductions in accordance with the regulations.

**ANSWER: Defendants admit deductions were made from Plaintiff's final paycheck pursuant to his agreements under the ICOA and LPA resulting in no net pay to Plaintiff. Defendants deny the remaining allegations in Paragraph 111 to the extent it calls for a conclusion of law and no response is required.**

112. CRST Transportation has also failed to pay Mr. McKnight any interest generated by his escrow fund accounts (General Escrow Fund, Performance Bond Escrow, Maintenance Reserve Fund Escrow, and Tax/Title/Permit Escrow) as required by 49 C.F.R. § 376.12(k)(5) and the ICOA with McKnight.

**ANSWER: Defendants admit no funds were returned to Plaintiff. Defendants deny Plaintiff was entitled to the return of any funds and deny the remaining allegations in Paragraph 112 to the extent it calls for a conclusion of law and no response is required.**

113. CRST Transportation's retention and conversion of Mr. McKnight's escrowed funds monies violates 49 C.F.R. §376. 12(k).

**ANSWER: Denied.**

114. CRST Transportation's and CRST Lincoln's LPA and ICOA give them the

right to make certain deductions for payment from Mr. McKnight's compensation and 49 C.F.R. § 376.12(I) mandates that those terms be specified in the agreements.

**ANSWER: Paragraph 114 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

115.    Defendants unlawfully reduced Mr. McKnight's weekly compensation by collecting monies at $.15-$.19 per mile from Mr. McKnight's income which were earmarked toward maintenance and the preservation of his LPA Vehicle, by claiming such payments constituted "additional rent" payments for a "Comprehensive Maintenance Furnished by Lessor (CRST Lincoln and its assignee CRST Transportation)."

**ANSWER: Denied.**

116.    Even though Mr. McKnight set aside monies for a comprehensive maintenance program, Defendant refused to perform comprehensive maintenance on Mr. McKnight's LPA vehicle with the monies they received from Mr. McKnight.

**ANSWER: Denied.**

117.    The "additional rent" Defendants charged Mr. McKnight for a comprehensive maintenance program that never existed and was part of CRST Lincoln's and CRST Transportation's scheme to unlawfully reduce Mr. McKnight's compensation for their own use and gain. The illusory program violated the truth and leasing regulations.

**ANSWER: Denied.**

118.    CRST Transportation's and CRST Lincoln's retention of the funds Mr. McKnight paid toward comprehensive maintenance for which he never received, totaling $12,082.20, violates 49 C.F.R. §376. I 2(k).

**ANSWER: Denied.**

119.     CRST Transportation and CRST Lincoln unlawfully charged Mr. McKnight for the LPA vehicle, deductions, and charge backs even after Defendants took possession of the LPA Vehicle on February 5, 2025 and after the LPA/ICOA were terminated.

**ANSWER: Denied.**

120.     CRST Transportation and CRST Lincoln interfered with McKnight's possession of his LPA vehicle by reducing the loads he was authorized to take, by controlling how and when he used the LPA Vehicle, by refusing to perform maintenance on the LPA Vehicle as necessary and/or as required, by unlawfully profiting from charge backs, deductions, and insurance overages at McKnight's expense, and by unlawfully reducing his compensation.

**ANSWER: Denied.**

121.     CRST Transportation and CRST Lincoln have failed to return Mr. McKnight's security fund(s), bond deposits, vehicle equity payments, or the escrow funds and interest for which he is entitled.

**ANSWER: Defendants admit no funds were returned to Plaintiff. Defendants deny Plaintiff was entitled to the return of any funds and deny the remaining allegations in Paragraph 121.**

122.     CRST Transportation and CRST Lincoln profited from the sale of force-placed insurance without a license and in violation of the federal regulations controlling lease purchase and operator agreements.  In doing so, Defendants illegally reduced Mr. McKnight's revenue and then failed to provide settlement statements and freight bills to prevent disclosure of its illegal actions.

**ANSWER: Denied.**

123.     As a lease-purchase operator, Mr. McKnight received compensation from CRST Transportation based on a fixed percentage of the adjusted gross revenue billed to the shipper.

**ANSWER: Defendants admit Plaintiff's base compensation under the ICOA was based on a percentage of the adjusted gross revenue billed to the shipper. Defendants deny the remaining allegations in Paragraph 123.**

124.     Mr. McKnight requested that CRST Transportation provide him with the rated freight bills for shipments he transported for CRST Transportation to enable Mr. McKnight as a lease-purchase operator to verify the amount of adjusted gross revenue billed by CRST Transportation.  In violation of 49 C.F.R. § 376.12 (g), CRST Transportation never provided copies of the rated freight bill.

**ANSWER: Denied.**

125.     CRST Transportation and CRST Lincoln failed to remit payments owed in the time prescribed by the regulations.  See C.F.R. § 376.12(f).

**ANSWER: Denied.**

126.     As a result of CRST Transportation's and CRST Lincoln's actions and inaction, Mr. McKnight has been damaged due to the reduction in his pay settlements, the loss of vehicle equity proceeds, the loss of his escrow funds and interest thereon, loss of security deposit, the unlawful reductions made against his compensation, the loss of his performance bond and all funds  held in escrow, the unlawful taking of funds paid toward maintenance for which he never received and Defendants' ongoing interference with McKnight's access to money they owe to him. Mr. McKnight is entitled to recover the damages he sustained and

the injunctive relief requested herein.

**ANSWER: Denied.**

## COUNT II
## BREACH OF FIDUCIARY DUTY

Plaintiff realleges and incorporates the allegations of the previous paragraphs 1-90 and makes them a part hereof.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

127.    CRST Transportation and CRST Lincoln owed a fiduciary duty to  Mr. McKnight by virtue of their agreements and actions in billing for his services, collecting his revenue, retaining escrow funds, paying insurers on his behalf and by virtue of their duty to account for those funds and for revenue billed as a result of his efforts.

**ANSWER: Denied.**

128.    CRST Transportation and CRST Lincoln undertook and accepted this fiduciary duty as part of their agreement with Mr. McKnight and by collecting and controlling his revenue and by disbursing funds from his pay settlements.

**ANSWER: Denied.**

129.    Additionally, CRST Transportation and CRST Lincoln collected and held information that was essential to Mr. McKnight in the operation of his business as an independent contractor lease-purchase operator.  McKnight did not have access to this information, even though he was supposed to be given access to it by CRST Transportation and CRST Lincoln pursuant to law.

**ANSWER: Denied.**

130.    CRST Transportation breached its fiduciary duty to Mr. McKnight in a

number of ways including among others: by improperly reducing his pay with inflated and illegal deductions including charging him for occupational insurance when none was required or provided; controlling when and at what price repairs would be done on his truck all the while collecting monies for each mile traveled which Defendants falsely claimed was for McKnight's comprehensive maintenance program; by refusing service for the LPA Vehicle, by designating the insurer for McKnight's truck and the insurance products Defendants required Mr. McKnight to purchase from Defendants' direct affiliates; failing to return the escrow funds and interest thereon acquired from McKnight; converting the truck itself and additional equipment installed and purchased by McKnight; and by encumbering the truck's use which interfered with McKnight's ability to make a living.

**ANSWER: Denied.**

131.     As a direct and proximate cause of CRST Transportation's breach of its fiduciary duty, Mr. McKnight has been damaged.

**ANSWER: Denied.**

## COUNT III
## BREACH OF CONTRACT

Plaintiff realleges and incorporates the allegations of the previous paragraphs 1-90 and makes them a part hereof.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

132.     On April 6, 2022, Mr. McKnight entered into an ICOA with CRST Transportation.

**ANSWER: Admitted.**

133.     On April 7, 2022, Mr. McKnight executed CRST Lincoln's LPA and took

possession of his LPA Vehicle.

**ANSWER: Admitted.**

134.    Mr. McKnight reasonably tendered all performance as required under the LPA and ICOA to the best of his ability under the circumstances plead herein.

**ANSWER: Denied.**

135.    CRST Lincoln and CRST Transportation undertook a contractual obligation to lease the subject vehicle to Mr. McKnight without unlawful intrusion and they breached the LPA and ICOA by failing to provide the same.

**ANSWER: Denied.**

136.    CRST Transportation and CRST Lincoln breached their contracts with Mr. McKnight and then unlawfully notified McKnight that they were terminating their contracts with him while continuing to charge Mr. McKnight for goods and services he never received.

**ANSWER: Denied.**

137.    CRST Transportation and CRST Lincoln also breached their covenant of good faith and fair dealing by depriving Mr. McKnight the benefits of his lease or the open enjoyment and use of his LPA Vehicle as required and permitted by law.

**ANSWER: Denied.**

138.    Defendants breached their agreements with McKnight by the following:

A.    CRST Transportation and CRST Lincoln deducted the weekly installment payments and fees for such agreements from the compensation of Mr. McKnight but has failed to account for those.

B.    CRST Transportation deducted numerous charges from pay settlements of Mr. McKnight but failed to provide him documents from which he could check the validity of the charges.

C.      CRST Transportation failed to pay interest on escrow funds or to account for those despite its obligations under the truth in leasing regulations.

D.      CRST Transportation failed to return Mr. McKnight's escrow funds.

E.      CRST Transportation failed to provide freight bills and settlement statements.

F.      CRST Lincoln and CRST Transportation breached their agreements by charging Mr. McKnight for a comprehensive maintenance program for which he never received.

G.      CRST Lincoln and CRST Transportation breached their agreements with Mr. McKnight by interfering Mr. McKnight's use and quiet enjoyment of his LPA Vehicle to the point it made Mr. McKnight's continued performance under the LPA and ICOA impossible.

H.      At all relevant times, Defendants changed and/or manipulated the times it would pay driver settlements in order for drivers such as Mr. McKnight to accrue additional expenses prior to hauling the next load. By manipulating the payments, Defendants prevented McKnight and other drivers from getting ahead financially. Defendants manipulation of payments violates the leasing regulations for when and how drivers should be compensated by a regulated motor carrier under the DOT.

**ANSWER: Defendants deny Paragraph 138 and each of its subparts.**

139.    CRST Transportation and CRST Lincoln acting jointly also breached their contract when they failed to use the funds paid by Mr. McKnight to maintain his LPA Vehicle when he requested.

**ANSWER: Denied.**

140.    As a result of CRST Transportation's and CRST Lincoln's breach of their agreements, Mr. McKnight has been damaged and continues to be damaged.

**ANSWER: Denied.**

**COUNT IV**
**CONVERSION**

Plaintiff re-alleges and incorporates herein by reference the allegations contained in the proceeding paragraphs 1-90.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

141.    CRST Transportation and CRST Lincoln, without right or permission, has improperly exercised illegal dominion and control over Mr. McKnight's property and the funds he entrusted to Defendants which were earmarked for a specific purpose.

**ANSWER: Denied.**

142.    CRST Transportation and CRST Lincoln converted for their own use with no intention of returning Mr. McKnight's truck equity payments, the truck, the equipment he installed therein, vehicle payments, and his escrowed funds. This conversion of McKnight's property was knowing, intentional, and malicious.

**ANSWER: Denied.**

143.    As a proximate result of this conversion, Mr. McKnight has been damaged.

**ANSWER: Denied.**

144.    Mr. McKnight is entitled to damages equal to the full value of assets at the time of CRST Transportation's and CRST Lincoln's conversion, as well as punitive damages.

**ANSWER: Denied.**

## COUNT V
## UNJUST ENRICHMENT

Plaintiff re-alleges and incorporates herein by reference the allegations contained in the proceeding paragraphs 1-90.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

145.    As a result of their conduct, CRST Transportation and CRST Lincoln have

been unjustly enriched at the expense of Mr. McKnight by receiving and taking money Mr. McKnight paid to them for Comprehensive Maintenance Program to be furnished by Defendants as detailed above.

**ANSWER: Denied.**

146.     From April 2022 and continuing through April 2023, CRST Transportation and CRST Lincoln collected, received, controlled, and used the $12,082.20 Mr. McKnight paid Defendants for a comprehensive maintenance program (in name only) he never received.

**ANSWER: Denied.**

147.     Despite Defendants receiving the monies paid by Mr. McKnight toward the comprehensive maintenance of his LPA Vehicle, Defendants refused at all relevant times to use the collected funds to provide the comprehensive maintenance that was necessary or required to maintain Mr. McKnight's LPA in great working order.

**ANSWER: Denied.**

148.     Instead, CRST Lincoln and CRST Transportation were unjustly enriched by their receipt and use of the funds for their own use and gain and to the detriment of Mr. McKnight and his LPA Vehicle.

**ANSWER: Denied.**

149.     Mr. McKnight demands judgment against Defendants, jointly and severally, to compensate him for the losses incurred.

**ANSWER: Paragraph 149 constitutes Plaintiff's demand for relief and no response is required. To the extent a response is required, it is denied.**

**COUNT VI**
**FRAUD**

Plaintiff re-alleges and incorporates herein by reference the allegations contained in the proceeding paragraphs 1-90.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

150.    Starting in orientation in March 2022 and continuing through January 2023, CRST Transportation and CRST Lincoln made false statements of material fact to McKnight regarding its payment and rate structure, services McKnight was purchasing, and how much they would pay him for his services, including but not limited to:

i.    CRST Transportation charging different rates to its customers then quoting lesser rates for those loads delivered by McKnight, thereby paying McKnight less during the final quarter of 2022 and upon information and belief throughout the LPA term;

ii.    Promising a certain pay structure and maintenance programs furnished by lessor in its standardized contracts to McKnight in order to induce McKnight to contract knowing it had no intent to honor that structure;

iii.    Misleading McKnight and other LPA owner operators under its pattern and practice to charge-back policies, administrative fee costs, labor rate charges, parts prices, and maintenance costs;

iv.    Misrepresenting to McKnight that his pay would be provided within the time frame required by the truth-in-leasing regulations, knowing that they had a worked in concert to create a policy and practice of failing to provide McKnight's compensation, incentive pay, and escrow payments in full or within the time permitted by the statute;

v.    Misleading McKnight and owner-operators under their pattern and practice as to the documentation necessary to receive pay and/or the manner in which such

documentation must be provided, then refusing to pay some or all of the monies owed in violation of its representations and agreements.

vi.     Misrepresenting to McKnight under their pattern and practice that he could purchase his vehicle upon request at any time during the lease term and/or that he could freely use the same without interference or intrusion, while having no intent to honor McKnight's LPA owner's right to purchase or to fully use the vehicle during the lease purchase term.

vii.     By making false statements to McKnight at the time he signed the LPA and ICOA about the number of CRST Transportation's and CRST Lincoln's LPA owner-operators who successfully paid for and acquired their LPA vehicle from CRST Transportation to induce McKnight to execute the LPA and ICOA. At the time such statements were made to McKnight, CRST Transportation and CRST Lincoln had a pattern and practice of denying operators the right to pay off or freely use their trucks and overcharging LPA owner-operators and preventing the majority of CRST Transportation's and CRST Lincoln's LPA owner-operators from ever acquiring clean title to their LPA vehicle.

viii.     CRST Transportation misrepresented to McKnight that he was required to purchase occupational insurance as a condition of employment when in fact he had no such requirement and received no coverage for the funds deducted by CRST Transportation for such coverage.

ix.     Misleading and misrepresenting to McKnight that the additional funds he paid for CRST Lincoln's comprehensive maintenance program at the rate of $.15 - $.19 per mile would be used for the comprehensive maintenance of his LPA Vehicle.

x.     Misrepresenting to McKnight that the LPA Vehicle he received had

low miles and was in great used condition in order to induce his acceptance and performance without disclosing the ill condition of the vehicle provided.

xi.     By willfully and knowingly concealing the true mileage of the LPA Vehicle Defendants unilaterally selected for Mr. McKnight in order to induce his acceptance and performance, all the while knowing the LPA Vehicle had hundreds of thousands more miles than the mileage reflected on the odometer when they provided it to Mr. McKnight on April 7, 2022.

xii.     By misrepresenting to McKnight that he was required to purchase occupational insurance as a condition of employment when in fact he had no such requirement and received no coverage for the funds deducted by CRST Transportation for such coverage.

xiii.    By misrepresenting to McKnight that he was required to purchase physical damage insurance, non-trucking liability insurance, UM-UIM insurance, and bobtail insurance from its sister company/affiliate Great Plains Casualty as a condition of employment when in fact he had no such requirement and could freely purchase and shop insurance from other providers.

xiv.     By unlawfully profiting from the sale of insurance as a result of overcharging Mr. McKnight for all insurance products they required him to purchase.

**ANSWER: Defendants deny Paragraph 150 and each of its subparts.**

151.    CRST Transportation and CRST Lincoln had and has a pattern and practice of making false statements and misrepresentations to LPA McKnight and owner-operators to induce them to contract with CRST Transportation and CRST Lincoln and entrust CRST Transportation with the revenue they each earned.

**ANSWER: Denied.**

152.    CRST Transportation and CRST Lincoln knew or believed their statements of material facts to McKnight were false or made statements of material facts to McKnight with culpable ignorance of their truth or falsity because, inter alia:

i.    CRST Transportation's and CRST Lincoln's agents were aware of pay rates promised to McKnight and owner-operators, often in writing through text or e-mail, but then refused to honor those rates during McKnight's tenure as CRST Transportation's and CRST Lincoln's LPA owner-operator, including the period after Defendants unilaterally terminated their ICOA and LPA with McKnight.

ii.    CRST Transportation's and CRST Lincoln's agents regularly provided contradictory and misleading statements in response to McKnight's pay disputes, or ignored the disputes altogether.

iii.    CRST Transportation's and CRST Lincoln's agents regularly provided contradictory, misleading information regarding pay rates for specific customers' loads, charge backs, and other items. For McKnight, for example, this occurred with virtually every load from April 7, 2022 through February 5, 2023.

iv.    CRST Transportation's and CRST Lincoln's agents had a policy and practice of unilaterally changing contract terms regarding pay, maintenance programs, deductions, purchase provisions, and termination without the owner- operators' consent or knowledge, in violation of their contracts, and ignored questions from McKnight and LPA owner-operators about why they were doing so.

v.    CRST Transportation  had a policy and practice of promising its potential LPA owner-operators, including McKnight, that LPA Drivers  and company drivers

had equal access to haul the high paying loads CRST Transportation received, knowing at the time such representations were made that CRST Transportation routinely gave the high paying loads to its company drivers without providing CRST Transportation's LPA owner-operators the right to select the load. CRST Transportation's pattern and practice of denying the best load to its LPA drivers created an avenue for CRST Transportation to terminate McKnight's LPA and ICOA.

      vi.    CRST Transportation's and CRST Lincoln's agents acted jointly to refuse to provide documentation, such as freight bills and charge back costs, to McKnight and other owner-operators who disputed pay issues. For McKnight, for example, CRST Transportation's agents refused to provide freight bills upon his request on multiple occasions from May 2022 through the beginning of February 2023, sometimes ignoring him all together. Defendant CRST Transportation refused all of McKnight's requests and claimed the pay settlement statements were sufficient. McKnight requested the freight bills and cost documentation in order to verify the payments, deductions, and charge-back's made on what CRST Transportation called its pay settlement statements.

      vii.    McKnight and other LPA owner-operators have repeatedly complained to CRST Transportation's and CRST Lincoln's agents of pay discrepancies and have brought these unlawful practices to Defendants' attention internally, yet Defendants knowingly refused to change its unlawful practices.

      viii.    CRST Transportation and CRST Lincoln had a pattern and practice of knowingly making false statements to McKnight and other LPA owner- operators about how they could use their escrowed funds, additional payments made for the comprehensive maintenance program, and/or how Defendants would seek to use the escrowed funds. Both

CRST Transportation and CRST Lincoln told McKnight the money he deposited in the general escrow, performance bond escrow, and comprehensive maintenance program account, and tax/toll/permit escrow accounts with Defendants was his money to be used for McKnight's benefit, knowing Defendants had no intention to allow McKnight to use or withdraw his escrowed funds for his benefit. When CRST Transportation and CRST Lincoln made these statements, they knew such statements were not true because they would ultimately confiscate, take, and convert the monies McKnight entrusted to them, as well as McKnight's final pay when they decided to terminate McKnight's ICOA and LPA.

**ANSWER: Defendants deny Paragraph 152 and each of its subparts.**

153. CRST Transportation intended that McKnight would rely on its promises and statements in choosing to contract initially, and in continuing to entrust his monies with them and in continuing do business with CRST Transportation and its leasing arm, CRST Lincoln.

**ANSWER: Denied.**

154. McKnight relied upon CRST Transportation's and CRST Lincoln's false statements in making business decisions, as evidenced by, inter alia:

i. Choosing to contract with CRST Transportation and CRST Lincoln in the first place based on CRST Transportation's and CRST Lincoln's representations as to its escrow accounts, pay rates and pay structure, and his ability to own his own truck.

ii. Choosing to accept certain loads based on quoted rates, only to discover that this CRST Transportation paid a less percentage pay than it actually received from the customer;

iii. Choosing to deposit funds in the general escrow account, performance

bond escrow account, tax/title/permit escrow, and maintenance program account managed by CRST Transportation and CRST Lincoln only to discover that Defendants would claim all of his funds as their own.

iv.     Choosing to accept a position with CRST Transportation and CRST Lincoln as their ICOA/LPA driver based on the representation that loads would be equally offered to CRST Transportation's company and its LPA drivers, only to discover that CRST Transportation gave the highest paying loads first to its company drivers.

v.     By relying on CRST Transportation's and CRST Lincoln's statements concerning insurance and paying for insurance products only to discover he was not required by law to carry the insurance products for which CRST Transportation deducted his pay.

vi.     By paying his lease purchase payments to CRST Transportation toward the purchase of his LPA vehicle, only to discover CRST Transportation and CRST Lincoln would jointly work together to interfere with his use and enjoyment of the LPA Vehicle.

**ANSWER: Defendants deny they made any false statements to Plaintiff. Defendants deny the remaining allegations in Paragraph 154 and each of its subparts for lack of knowledge or information.**

155.     As a direct and proximate result of CRST Transportation's and CRST Lincoln's fraudulent conduct, Defendants damaged McKnight in amounts to be determined according to proof at trial, by underpaying him, overcharging him, taking his escrow and maintenance program money, taking his truck, taking the equity McKnight paid toward owning his own truck, by overcharging him for standard deductions and charge backs, by fraudulently inflating the amounts and types of insurance required while profiting from the

overages charged, by fraudulently inducing him to contract, and by their continued fraud during the LPA/ICOA term so that McKnight would continue to do business with CRST Transportation and CRST Lincoln.

**ANSWER: Denied.**

## COUNT VII
### VIOLATIONS OF THE FEDERAL VEHICLE INFORMATION AND COST SAVINGS ACT(the "Odometer Act") 49 U.S.C. §§ 32701, 32710(a)-(b) *et. seq.*

Plaintiff re-alleges and incorporates herein by reference the allegations contained in the proceeding paragraphs 1-90.

**ANSWER: Defendants reassert and incorporate their responses to the allegation contained in Paragraphs 1-90 by this reference as if fully set forth herein.**

156.    As a lender, dealer, and motor carrier, Defendants have an obligation to properly represent and convey correct and truthful details concerning each vehicle leased/purchased and/or sold to contractors.

**ANSWER: Paragraph 156 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

157.    Defendants defrauded McKnight of the actual odometer miles his LPA Vehicle had traveled prior to McKnight's ownership and possession under his LPA.

**ANSWER: Denied.**

158.    At all times prior to receiving his LPA Vehicle and signing his LPA with CRST Lincoln, Defendants CRST Lincoln and CRST Transportation assured Mr. McKnight he was receiving a lightly used LPA Vehicle with low miles. Defendants each assured Mr. McKnight the LPA Vehicle they were assigning to him was in great condition. Despite such assurances and Mr. McKnight's requests, Defendants never provided any government

disclosures or logs concerning the vehicle's history, condition, or mileage before it assigned the LPA Vehicle to Mr. McKnight.

**ANSWER: Denied.**

159.    Mr. McKnight agreed to execute the LPA in order to receive what he believed to be a low mileage lease purchase vehicle.

**ANSWER: Denied for lack of knowledge or information.**

160.    Mr. McKnight was so excited about receiving a low mileage vehicle that he took a picture of the vehicle's odometer when he took possession on April 7, 2022.

**ANSWER: Denied for lack of knowledge or information.**

161.    On June 1, 2022, Mr. McKnight took his LPA Vehicle in for its preventative and routine maintenance service. During this service, the mechanics checked the vehicle and its electronic control unit (ECU) and modules (ECM). After reading the LPA Vehicle's ECU and ECM and setting the system, the vehicle's actual mileage of 305,209 was immediately displayed on the vehicle's odometer. When McKnight picked up the LPA Vehicle he was shocked, depressed, and he felt robbed by CRST Lincoln and CRST Transportation.

**ANSWER: Denied for lack of knowledge or information.**

162.    At the time the LPA was signed, CRST Transportation and CRST Lincoln required Mr. McKnight to signed many documents, but they did not permit Mr. McKnight to review the logs of the LPA Vehicle he was provided, despite his request.

**ANSWER: Defendants admit Plaintiff signed multiple documents at the time the LPA was signed. Defendants deny the remaining allegations in Paragraph 162.**

163.    The transfer forms for the LPA were not the official, secured forms as required by the Odometer Act, see 49 C.F.R. § 580.4 (2000), and the documents provided

did not contain certain mandatory disclosures.

**ANSWER: Paragraph 163 calls for a conclusion of law and no response is required. To the extent a response is required, it is denied.**

164. Instead, Defendants showed McKnight the LPA Vehicle's mileage and bragged about how he was receiving such a low mileage LPA Vehicle.

**ANSWER: Denied.**

165. Defendants used their own forms and devices to conceal what the odometer reading would have revealed. Mr. McKnight would not have accepted the terms of the LPA, the LPA Vehicle, or taken possession of such a high mileage LPA Vehicle had he known its actual mileage.

**ANSWER: Denied.**

166. Defendants defrauded, misrepresented, and intentionally concealed the vehicle's actual mileage in order to induce Mr. McKnight's performance and acceptance of the LPA Vehicle.

**ANSWER: Denied.**

167. CRST Lincoln and CRST Transportation intended to defraud Mr. McKnight in violation of the Odometer Act because they rolled back the miles on the odometer prior to executing the LPA contract with Mr. McKnight and prior to assigning him the LPA Vehicle.

**ANSWER: Denied.**

168. Defendants jointly and severally violated the Odometer Act and are liable to Mr. McKnight for three times the actual damages he incurred or $10,000.00, whichever is greater. *See* 49 U.S.C. § 32710(a) and attorneys' fees and costs in accordance with the

statute. 49 U.S.C. § 32710(b).

**ANSWER: Denied.**

169.    Mr. McKnight demands judgment against Defendants, jointly and severally, to compensate him for the losses incurred.

**ANSWER: Paragraph 169 constitutes Plaintiff's demand for relief and no response is required. To the extent a response is required, it is denied.**

**The remainder of Plaintiff's Amended and Restated Complaint constitutes his prayer for relief and no response is required. To the extent a response is required, it is denied.**

## AFFIRMATIVE DEFENSES

1.    Plaintiff's Complaint fails to state a claim upon which relief can be granted.

2.    Plaintiff's claims are barred due to his failure to perform his contractual obligations under his agreements with Defendants.

3.    Plaintiff's claims are barred under the doctrine of waiver and/or estoppel.

4.    Plaintiff's recovery, if any, must be reduced by his failure to mitigate his damages.

5.    The alleged acts and/or omissions of Defendants were not a proximate cause of damage to Plaintiff.

6.    Plaintiff's claims are barred under the economic loss rule.

7.    Defendants assert that, upon current information and belief, and pursuant to the respective agreements entered into between the parties, Defendants are not obligated to make any further payments to Plaintiff.

8.    Defendants reserve the right to assert additional affirmative defenses.

WHEREFORE, having answered Plaintiff's Amended and Restated Complaint and asserted their affirmative defenses, Defendants respectfully request that the Court dismiss Plaintiff's Complaint with prejudice at Plaintiff's cost and for whatever additional relief the Court deems just and necessary.

SIMMONS PERRINE MOYER BERGMAN PLC

By: /s/ Thomas D. Wolle
Thomas D. Wolle - AT0008564
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
Telephone:  (319) 366-7641
Facsimile:  (319) 366-1917
E-mail: twolle@spmblaw.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2024, I filed the foregoing using the CM/ECF system which will send notification of such filing to all attorneys and parties of record.

/s/ Thomas D. Wolle