# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

JEREMY MCKNIGHT; JAMES )
CRUTCHFIELD; CHRISTOPHER )
MCCAIN; WAYNE WOLF )
　　　　　　　　　　　　　　　 )
　　Plaintiffs, )
　　　　　　　　　　　　　　　 )
　　v. )　　　　CASE NO: 24-cv-0119-CJW-KEM
　　　　　　　　　　　　　　　 )
CRST LINCOLN SALES, INC.; )
CRST EXPEDITED INC. D/B/A )
CRST THE TRANSPORTATION )
SOLUTION, INC. )
　　　　　　　　　　　　　　　 )　　　　DEMAND FOR JURY TRIAL
　　Defendants. )

## SECOND AMENDED AND RESTATED COMPLAINT

COME NOW, Jeremy McKnight, ("Mr. McKnight"), Christopher McCain ("Mr. McCain"), James Crutchfield ("Mr. Crutchfield"), and Wayne Wolf ("Mr. Wolf) (collectively "Plaintiffs"), by and through their undersigned counsel, and file this Second Amended and Restated Complaint against Defendants CRST Lincoln Sales, Inc. ("CRST Lincoln"), CRST Expedited, Inc. d/b/a CRST The Transportation Solution, Inc. ("CRST Transportation") (collectively "Defendants") alleging as follows:

1

## JURISDICTION AND VENUE

1.      Jurisdiction is granted to this Court by 28 U.S.C. §§ 1331 (federal question jurisdiction), and 1337 (proceedings arising under an act of Congress regulating commerce). The causes of action here arise under The United States' laws regulating commerce and the activities of motor carriers engaged in the transportation of property in interstate commerce, including 49 U.S.C. §§ 13501, 14102 and 14704(a)(l) and (2), and 49 C.F.R. § 376 et seq. The Court has original and supplemental jurisdiction over Plaintiffs' claims filed against each defendant concerning their violations of The Federal Vehicle Information and Cost Savings Act (the "Odometer Act" or the "Act"), 49 U.S.C. §§ 32701 and 32710(a)-(b) et. seq.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 139l (b) in that CRST Transportation and CRST Lincoln are incorporated in Iowa and the Plaintiffs signed agreements containing an Iowa choice of law and forum clause for the Northern District of Iowa.

3.      Pursuant to, 28 U.S.C. §§ 1332 and 1367, including § 1367(a). The Court has supplemental jurisdiction over Plaintiffs' common law and statutory claims filed under Iowa's Wage Payment Collection Law, Iowa Code § 91A.1, et seq., for unlawfully deducting amounts from the Plaintiffs' wages of drivers that Defendants misclassified as independent contractors.

2

## PARTIES

4.     Mr. McKnight is an individual resident citizen of Pleasant Prairie, Wisconsin, and over the age of nineteen (19). He is a licensed commercial truck driver who was an "owner" who previously leased his truck and services to drive for CRST Transportation from its Birmingham, Alabama, location.

5.     Mr. Wolf is an individual resident citizen of Independence, MO, and over the age of nineteen (19). He is a licensed commercial truck driver who was an "owner" who leased-purchased his truck and services to drive for CRST Transportation from its Birmingham, Alabama, location.

6.     Mr. McCain is an individual resident of Arlington, TX, and over the age of nineteen (19). He is a licensed commercial truck driver who was an "owner" who leased-purchased his truck and services to drive for CRST Transportation.

7.     Mr. Crutchfield is an individual resident citizen of Kirbyville, MO, and over the age of nineteen (19).  He was an owner-operator for CRST Transportation from its Birmingham, Alabama.

8.     CRST Transportation is an Iowa corporation which operates a facility and principal place of business in Birmingham, Alabama, with offices situated in Vestavia Hills, Alabama. CRST Transportation's business in Birmingham, Alabama, was previously known as CRST Malone, Inc. At all relevant times, CRST Malone,

3

Inc.'s rights and obligations under existing LPAs and ICOAs were assumed and assigned to CRST Transportation in April 2021.

9.     CRST Transportation is a federally-regulated motor carrier that provides transportation of property in interstate commerce under authority granted by the U.S. Department of Transportation ("DOT").  During all times material to this case, CRST Transportation is and has been an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a).

10.     CRST Lincoln Sales, Inc. (hereinafter "CRST Lincoln") is an Iowa corporation, registered in Alabama as a foreign corporation. At all times herein, CRST Lincoln conducted business in this district and at its Birmingham and Vestavia Hills, Alabama, locations. CRST Lincoln acted as CRST Malone's and CRST Transportation's credit lender and leasing company for CRST's lease purchase owner-operators "owner" drivers such as Mr. McKnight, Mr. Wolf, Mr. Crutchfield, and Mr. McCain.

12.     As a credit lender and leasing company, CRST Lincoln also provided financing for lease purchase contracts with CRST Transportation's independent contractors, including Plaintiffs.  The two Defendants are interconnected, share the same locations, directors, shareholders, and officers. As a result of their operation, CRST Lincoln and CRST Transportation operate as a motor carrier while

4

simultaneously acting as an equipment leasing company whose agreements with Messrs. McKnight, McCain, Crutchfield, and Wolf are subject to the Federal Truth-In-Leasing Regulations.

13.     All actions and omissions described in this complaint were made by Defendants directly or through their supervisory employees and agents.

14.     Defendant CRST Transportation was, at all relevant times, Plaintiffs' "employer" under the Iowa Wage Payment Collection Law, Iowa Code § 91A.1, et seq.,

15.     CRST Transportation and CRST Lincoln engaged in a course of conduct, and in concert, whereby they acted as a single common enterprise which violated federal and state law as described in the following paragraphs of this Complaint.

## FACTS

## I.     General Facts Applicable to All Parties:

### A.     Defendants' LPA/ICOA Program:

16.     As a regulated motor carrier, CRST Transportation primarily engages in providing transportation services to the shipping public using tractor-trailers under authority granted by the United States Department of Transportation (DOT).  CRST Transportation conducts its carrier service by hiring Plaintiffs and others as lease purchase operators who are employed under its Independent Contractor Operating

5

Agreement (ICOA) and by a Lease-Purchase Agreement (LPA) with CRST Lincoln (the LPA is applicable to Wolf, McCain, and McKnight).

17. Under federal law and regulations, "authorized motor carriers" such as CRST Transportation may perform authorized transportation in equipment they do not own only if the equipment is covered by a written lease meeting the requirements set forth in Section 49 Code of Federal Regulations, Part 376, Section 367.12 and corresponding sections. See 49 C.F.R. § 376.1 l (a) et seq. Section 376.12 requires CRST Transportation and its leasing affiliate CRST Lincoln to include, and adhere to, specifically prescribed lease and payment terms in owner-operator and lease-purchase agreements (also known as contractor agreements and standard leases).

18. At all relevant times, Plaintiffs earned their living as commercial truck drivers.

19. At all relevant times, Plaintiffs worked and/or work for CRST Transportation under authority granted to CRST by DOT.

20. Plaintiffs, as a condition of their employment, entered into (1) an Independent Carrier Operator Agreement (ICOA) with CRST Transportation as the motor carrier; and (2) a Lease Purchase Agreement (LPA) with CRST Lincoln if they did not own their own tractor/vehicle. CRST Transportation's and CRST Lincoln's ICOA with Plaintiffs were nonnegotiable form contracts. Examples of the agreements

6

were previously filed with Plaintiff McKnight's Amended Complaint (Doc. 3) as Exhibits A (Doc. 3-1) and B (Doc. 3-2). The terms of the ICOA and LPA remained the same for all Plaintiffs.

21.     Mr. Crutchfield owned his vehicle and did not execute an LPA to drive for CRST Transportation as an Owner-Operator under the ICOA.

22.     Under the LPA and ICOA, Messrs. McKnight, Wolf, and McCain were both a Lease Purchase Owner and Operator and a Lessor.

23.     The LPA and ICOA agreements are interrelated and essentially operate as one agreement, all of which originated from the same controlling parties.

24.     For instance, the LPA with CRST Lincoln purportedly gives rights to CRST Transportation to collect the CRST Lincoln lease payments from Plaintiffs' earnings with CRST Transportation and also provides that CRST Lincoln's LPA terminates when CRST Transportation's ICOA terminates.

25.     Plaintiffs were not allowed time to seek counsel to review the agreements and they were not allowed to negotiate and/or request changes to the LPA and ICOA terms.

26.     Defendants selected the LPA Vehicles for Wolf, McKnight, and McCain. Neither CRST Transportation nor CRST Lincoln allowed Plaintiffs to review the logs and/or inspect their respective LPA Vehicle. Defendants required each to accept the

7

LPA vehicle "as is" or not accept it at all.

27.    Plaintiffs relied on Defendants' representations concerning the condition of the LPA Vehicles Defendants selected for them and the terms/condition of the contract before executing Defendants' agreements in return.

28.    As part of the LPA's and ICOA's requirements, Plaintiffs had to sign an "Authorization and Assignment" which directed the "Carrier" shown as CRST Transportation to pay itself lease payments and contractor charge-backs/deductions from Plaintiffs' earnings.

29.    CRST Transportation, CRST Lincoln, and their affiliates did not permit Plaintiffs Wolf, McCain, and McKnight to review the logs of the LPA Vehicle they were provided, despite their request.

30.    At all times, CRST Transportation controlled Plaintiffs' possession and use of Plaintiffs' own vehicles.

31.    The ICOA classified drivers as independent contractors in part so that CRST could shift the costs of operating the trucks onto the Plaintiffs and other drivers.  Defendants used the ICOA to control Plaintiffs' possession and use of Plaintiffs' own vehicles.

32.    Despite the contractor designation, CRST Transportation controlled Plaintiffs' possession and use of their LPA or personal vehicles, the funds for

8

Plaintiffs' business, scheduling, maintenance, escrow accounts/banking, hours, and pay.

33.     The ICOA forbids Plaintiffs from freely using their vehicle to haul loads from other motor carriers in order to cover the ICOA standard deductions and/or the lease-purchase agreement payments. CRST Transportation required Plaintiffs to haul loads assigned by its dispatchers and driver managers.

34.     When Defendants failed to assign sufficient loads to cover Plaintiffs' costs, Plaintiffs asked if they could haul loads for other carriers in the interim to ensure their ICOA and LPA obligations were met, but Defendants refused.

**Defendants' Unlawful Payment Practices and Scheme:**

35.     Since at least October 2013, CRST has a pattern and practice of using the LPA and ICOA to unlawfully reduce the compensation of its LPA/ICOA drivers like Plaintiffs.

36.     Defendants control Plaintiffs' work schedules through their exclusive control over the assignment of loads to Plaintiffs and by requiring them to work exclusively for CRST.

37.     Defendants control when, where, and how Plaintiffs deliver freight. Defendants dispatch Plaintiffs to jobs that Defendants wish them to perform.

38.     Defendants monitor and control the time of Plaintiffs' departure and the

9

time of arrival.

39.    Defendants can dictate and monitor the route Plaintiffs will travel. Defendants monitor Plaintiffs' location, speed, control of the truck, route, estimated arrival time, rest time, driving time, and other aspects of job performance by an on-board computerized system.

40.    By way of example of the control exercised by Defendants over Plaintiffs, Plaintiffs received communications and instructions on a daily or near daily basis by their "driver managers" regarding driving speed, arrival times, rest times, etc.

41.    Defendants control the amounts charged to the customers whose freight Plaintiffs deliver.

42.    Plaintiffs are paid by the load with the amount set and fixed by Defendants.

43.    Defendants dictate the means by which Plaintiffs are to perform their job and require Plaintiffs to adhere to Defendants' policies.

44.    Plaintiffs have no opportunity for profit and loss based on their entrepreneurial skill because CRST exercises exclusive control over their load assignments and compensation rates.

45.    CRST Lincoln's LPA with Plaintiffs Wolf, McCain, and McKnight provided that all monies needed for the lease purchase security deposit, escrow

10

maintenance account, general escrow account, performance bond, securement, and weekly vehicle lease payments would be held and collected by CRST Transportation from Plaintiffs' compensation.

46.    Defendants required Plaintiffs to fund the following accounts: maintenance escrow account, security deposit escrow, 2290 Escrow, tarp/chain/binder bond insurance, liability and damage insurance premium accounts, maintenance and other reserve fund escrow accounts, securement, additional premium account, and tax/title/permit/license escrow account.

47.    Mr. Crutchfield did not sign an LPA but CRST Transportation made the same LPA deductions from Crutchfield's compensation through its ICOA and even charged him for LPA payments until he resigned.

48.    Under the ICOA and LPA, Plaintiffs were the "owner" of LPA vehicle equipment within the meaning of 49 C.F.R. § 376.2(d), and a "lessor" of LPA motor vehicle equipment back to CRST Transportation within the meaning of 49 C.F.R. § 376.2(f).

49.    Plaintiffs' ICOA provides that they were to receive seventy-five percent (75%) of Adjusted Gross Revenue (hereinafter "AGR") as billed by CRST Transportation for the shipment based on the direct payment from the customer.

50.    The ICOA requires CRST Transportation to electronically post their

11

settlement statements showing the revenue and deductions and chargebacks based on actual costs. (Doc. 3-1, Exhibit A, § 3.1-5.1).

51. The ICOA includes the following definitions for Plaintiffs:

1(A)(2)(a). Gross Revenue shall mean all revenue - billed by Carrier to shippers, consignees, brokers, logistics companies, freight forwarders, other carriers, or other customers (referred to together as "Carrier's Customer" throughout this Agreement) in connection with shipments Contractor hauls under this Agreement - for pickup and delivery charges, mileage charges, linehaul transportation charges, hourly work, accessorial services, detention, and all other services, fuel surcharges, and other charges and surcharges.

52. To calculate AGR, CRST Transportation is supposed to start with the Gross Revenue for a particular shipment and reduce it by the following:

1(A)(2)(b). Adjusted Gross Revenue ("AGR") shall mean Gross Revenue for a particular shipment, reduced by any and all:

1(A)(2)(b)(1). Incentive, discount, fee (including for loading or unloading services provided by Carrier's Customer either directly or through a Third Party), or commission Carrier gives Carrier's Customer with respect to the shipment;

1(A)(2)(b)(2). All amounts Carrier paid to third parties, including but not limited to Carrier's Customer or an affiliate of Carrier, (together, "Third Parties") in relation to movement of the shipment if not covered by a charge separately stated on Carrier's invoice to Carrier's Customer, including, but not limited to, fees or commissions (including commission recoveries), paid to brokers, freight forwarders, interline, or augmenting carriers, warehouse or other storage providers, terminals, agents, or any other Third Party, expenses attributable to an accessorial service, escorts, overweight, overdimensional, or other permits, loading and/or unloading (including lumper) services, freight payment-

processing fees (consisting of the actual cost incurred by Carrier for the shipment if Carrier's customer or an outside payer makes deductions from Carrier's freight charges related to electronically-transmitted billing and payment account use), amounts paid or accrued for cartage, certain specialized trailers and excessive trailer spotting, tarping, or special security measures paid to a Third Party or to Contractor; and amounts paid to other contractors as a pro rata payment for their participation in the movement of a shipment; and

1(A)(2)(b)(3). Charges separately stated on Carrier's invoice to Carrier's Customer as fuel surcharges (or fuel or other cost adjustments or special fuel charges), detention charges actually received from the shipper, loading and unloading (including lumper) charges, "truck ordered but not used" charges, insurance surcharges, escort service charges, tolls, over-dimensional and other permits, trailer charges, cartage charges, spotting charges, freight payment processing fees, excess-value charges or high-value freight charges, surcharges for special security measures, charges for Third-Party contract services, charges for the international portion of loads going to or coming from Mexico, and charges for other services Carrier obtained from a broker, freight forwarder, interline or augmenting carrier, warehouse or other storage provider, terminal, agent, other independent contractor, or other third party.

53. Using the ICOA, CRST Transportation made weekly charge backs and deductions from Plaintiffs' compensation based on the cost values CRST Transportation assigned which include but were not limited to the following: road use tax deduction, license and permit deduction, fuel tax deduction, tarps/chains/binders deduction, trailer rent, network charges, electronic log charges, device rentals, pegasus scanning, bobtail/non-truck liability, physical damage, occupation, insurance, and worker's compensation coverage.

13

**Failure to Provide Supporting Documentation Upon Request:**

54.     Rate confirmation sheets and freight bills are the actual bills to CRST Transportation's customer which show the amount customers paid to CRST.

55.     Plaintiffs each requested rate confirmation sheets and freight bills from CRST Transportation to ensure they were receiving full payment, but Defendants refused.

56.     Plaintiffs requested supporting documentation for the costs of each deduction Defendants made against their pay, but they never received a detailed accounting or any cost/vendor/customer payment documentation from Defendants showing how the line haul percentages were determined or how their pay was adjusted based on the actual costs incurred by each Defendant.

57.     The only documents Plaintiffs received concerning costs were created by CRST Transportation's office and they were not the bills/receipts for costs.

58.     Upon information and belief, the deductions Defendants made against Plaintiffs' compensation for each charge back/deduction exceeded the cost incurred for the purposes of turning a profit for Defendants.

**Defendants' Manipulation of Payments**:

59.     At all relevant times, Defendants changed and/or manipulated the times it would pay Plaintiffs which caused Plaintiffs to accrue additional expenses prior to

14

hauling the next load. By manipulating the payment times, Defendants caused each Plaintiff to become indebted to Defendants.

60.    On at least one occasion, CRST Transportation reported they received less money from a customer after a load was delivered in order to pay Plaintiffs a lower line haul percentage than what CRST Transportation's freight bills showed was actually received by Defendants. Each Plaintiff experienced this practice and requested documentation for the reduction, but none was provided.

61.    On multiple occasions, CRST Transportation unilaterally reduced the Plaintiffs' pay after Plaintiffs hauled, unloaded, and delivered a load to CRST Transportation's customer. Plaintiffs each complained to Defendants when this occurred because the quoted rate was substantially higher than the rate Plaintiffs received days later noted on their respective settlement statements.

62.    Despite Plaintiffs' complaints, CRST Transportation never adjusted Plaintiffs' pay to reflect the quoted rate Plaintiffs received when they accepted the load. Plaintiffs were forced to accept payment because they would owe money to CRST after the charge backs for the respective load or fear default.

**Plaintiffs Paid For Comprehensive Maintenance They Never Received**:

63.    The ICOA and LPA designated that at least $.15 per mile would be deducted from McKnight's, McCain's, and Wolf's pay settlements and deposited in

their "Additional Rent/Maintenance and Other Reserve Fund" account for purposes of funding the all-inclusive "Comprehensive Maintenance Furnished by Lessor."

64. The Additional Rent/Maintenance and Other Reserve Fund Plaintiffs paid into was previously called an escrow account which Defendants had a pattern and practice of confiscating from drivers they terminated. After being sued for confiscating driver's escrowed funds, Defendants renamed this account as "additional rent." At all times, Defendants told Plaintiffs the money they paid into this account were Plaintiffs' escrowed funds to be used to fund the comprehensive maintenance program Defendants promised to provide Plaintiffs.

65. Defendants told Plaintiffs payments into the maintenance account were to cover any maintenance expense they needed or requested, but in actuality, the funds were taken and kept by Defendants.

66. CRST Transportation and CRST Lincoln controlled where Messrs. McKnight, Wolf, and McCain serviced and/or repaired the subject vehicle, as well as what maintenance services were done. McKnight, Wolf, and McCain intended to use their respective LPA vehicle for a very long time and they requested periodic maintenance be performed on their vehicle, but Defendants declined their requests even though they were all paying weekly for a comprehensive vehicle maintenance program funded by the "additional rent" charges by Defendants.

16

67.    At all times, CRST Transportation and CRST Lincoln decided what services could be done, what constituted comprehensive maintenance, when services could be performed, and the amount they were willing to pay. Plaintiffs paid thousands of dollars for a comprehensive maintenance program which they were never allowed to use.

**Defendants Unlawfully Profited From Forced Placed Insurance**:

68.    Defendants are not licensed to sell or procure insurance but they forced-placed multiple insurance products on each Plaintiff and set the weekly premium amounts they deducted from Plaintiffs' compensation.

69.    Defendants required Plaintiffs' non-trucking liability, bobtail, and Physical Damage Insurance from their sister company, Great Plains Casualty, Inc. Defendants set the premium amount for each policy and charged Plaintiffs a minimum .5% markup charge for force placing the insurance products. The amount of coverage was based off amounts assigned by CRST Transportation, not the actual liability Plaintiffs might face in the event of a loss.

70.    Defendants required all Plaintiffs to purchase UM/UIM coverage from their sister company, Great Plains Casualty, Inc. The premium amount and the designated administrative fee for this product were set by Defendants.

71.    The premium amounts Defendants deducted from Plaintiffs' income

exceeded the actual cost for the coverage provided to Plaintiffs and was in reality a revenue source CRST Transportation. The insurance premiums remained the same over the years without any premium reduction accounting for vehicle depreciation.

**Defendants' 2023 Payment Program Changes:**

72.     Starting in 2023, CRST Transportation changed its payment software and how and when it paid its LPA and ICOA drivers, including Plaintiffs.

73.     During this time, Plaintiffs complained to CRST Transportation about not being paid for almost months at a time and they complained about the shift in payments. Their complaints were never addressed.

74.     Instead, from March through May 2023, each Plaintiff received a notice from CRST Transportation alleging Plaintiffs were overpaid for fuel discounts for years and CRST demanded repayment concerning the same.

75.     Plaintiffs requested supporting documents for each alleged overpayment, but Defendants failed to produce the same. Defendants responded by unilaterally deducting set amounts from Plaintiffs' compensation without notice or the right to do so. If Plaintiffs' compensation did not cover the amount, Defendants took the same from Plaintiffs' escrowed funds.

76.     When McCain, McKnight, Wolf, and Crutchfield complained, Defendants reduced the loads assigned Plaintiffs and/or assigned Plaintiffs the least

18

profitable loads.

77.     Defendants' practice continued until McCain, McKnight, and Crutchfield were unable to pay for their obligations owed under the ICOA/LPA.

**Defendants' Pattern and Practice of Termination and Repossession:**

78.     CRST Transportation has a pattern and practice of forcing LPA/ICOA drivers like Plaintiffs to return their LPA Vehicles when they are almost paid for and then re-leasing/selling the LPA Vehicle.

79.     CRST Transportation has a pattern and practice of selling its least efficient vehicles to its LPA drivers without disclosing their maintenance history or forcing Plaintiffs to enter into a new lease purchase agreement when the maintenance account cannot cover needed repairs.

80.     CRST Transportation has a pattern and practice of not allowing Plaintiffs to use escrowed funds to repair their respective LPA Vehicle, knowing their practice causes the majority of drivers to default. Once defaulted, CRST Transportation repossesses the vehicle and either leases or sells the same in a bulk sale without crediting or paying the LPA Driver who defaulted.

81.     At all relevant times, Defendant CRST Transportation had a pattern and practice of unilaterally reducing the line haul percentage payments Plaintiffs Wolf, McCain, Crutchfield, and McKnight were entitled to receive.

19

82.     At all relevant times, CRST Transportation had a pattern and practice of paying a portion of the payments received from customers to CRST Transportation's driver managers/dispatchers prior to calculating the line haul percentage payment to Plaintiffs. Plaintiffs were damaged by the unlawful reduction.

83.     After Defendants terminated their agreements with Plaintiffs McKnight, McCain, and Crutchfield, CRST Transportation refused to return McKnight, McCain, and Crutchfield their accumulated escrow funds, interest payments, tax/title/toll escrow, or their bond monies deposited in CRST Transportation's account within forty-five (45) days. Defendants claimed the funds were used to pay the fuel and other deductions they claimed each Plaintiff owed. CRST Transportation told each Plaintiff they were not entitled to anything. Plaintiffs have been damaged as a result thereof.

84.     To date, none of the funds Mr. McKnight, McCain, and Crutchfield entrusted to CRST Transportation have been returned. Plaintiffs McKnight, McCain, and Crutchfield have been damaged as a result thereof.

85.     Defendants ignored their obligation to produce a full accounting and supporting documentation setting forth any deductions from Plaintiffs' escrow funds and actual costs for each charge back.

86.     As a result of CRST Transportation's and CRST Lincoln's actions and inaction, Messrs. McKnight, Crutchfield, Wolf, and McCain lost their ability to

20

successfully provide for themselves and their families.

87.    CRST Lincoln's and CRST Transportation's payment practices and repossessions plead above made it and/or are making it impossible for Plaintiffs to successfully perform per the terms of the ICOA and the LPA.

88.    As a result of CRST Transportation's and CRST Lincoln's actions and inaction, Plaintiffs have been and continue to be damaged.

**Plaintiff McKnight's Specific Facts:**

89.    In March 2022 - April 6, 2022, Mr. McKnight attended CRST Transportation's driver orientation school in Birmingham, Alabama.

90.    Based on the representations made by CRST Transportation's representatives, Mr. McKnight agreed to become a lease-purchase owner-operator with CRST Transportation and its lending arm, CRST Lincoln.

91.    Mr. McKnight signed his Independent Carrier Operator Agreement (ICOA) with CRST Transportation on April 6, 2022.

92.    The vehicle CRST Lincoln and CRST Transportation selected for Mr. McKnight was not available. As a result, Defendants required Mr. McKnight to drive to Iowa to pick up the replacement LPA Vehicle.

93.    On April 7, 2022, Mr. McKnight signed a lease-purchase agreement (hereinafter "LPA") with CRST Lincoln at Defendant's Iowa location. Under that

agreement, he leased-to-own from CRST Lincoln a 2020 Freightliner Cascadia, VIN Number: 3AKJHHDR9LSLP7298 ("LPA Vehicle"), unit number 104198. The LPA had a 217-week contract term and contained a purchase option which gave Mr. McKnight the right to purchase the subject vehicle during the term or at the end of the 217-week term (Doc. 3-2 - Exhibit B, p. 2 and "Schedule A").

94.     From April 7, 2022 through on or about February 5, 2023, Mr. McKnight worked for CRST Transportation and CRST Lincoln as a lease-purchase "owner"-operator.

95.     When Mr. McKnight received his LPA Vehicle on April 7, 2022, the odometer stated the LPA Vehicle had 19,303 miles prior to McKnight signing the LPA.

96.     At all times prior to signing the LPA, Defendants represented to Mr. McKnight that he was receiving a very low mileage truck. Despite such assurances, Defendants never provided any government disclosures or logs concerning the vehicle's history, condition, or mileage before they assigned the LPA Vehicle to Mr. McKnight.

97.     Mr. McKnight was so excited about receiving a low mileage vehicle that he took a picture of the vehicle's odometer when he took possession on April 7, 2022.

98.     When McKnight's LPA Vehicle was first serviced in June 2022, the

22

vehicle's computer was scanned for any faults. Once the scanning was complete, the odometer rollback was correct and the LPA Vehicle's odometer stated 305,209 miles.

99.    At the time the LPA was signed, CRST Transportation and CRST Lincoln required Mr. McKnight to sign many documents, but they did not permit Mr. McKnight to review the logs of the LPA Vehicle he was provided, despite his request. The transfer forms for the LPA were not the official, secured forms as required by the Odometer Act, (see 49 C.F.R. § 580.4 (2000)), and did not contain certain mandatory disclosures. Instead, Defendants showed McKnight the LPA Vehicle's mileage and bragged about how he was receiving such a low mileage LPA Vehicle.

100.    Defendants used their own forms and devices to defraud and intentionally conceal what the odometer reading would have revealed in order to induce Mr. McKnight's performance and acceptance of the LPA Vehicle. Mr. McKnight would not have accepted the terms of the LPA, the LPA Vehicle, or taken possession of such a high mileage LPA Vehicle had he known its actual mileage.

101.    CRST Lincoln and CRST Transportation intended to defraud Mr. McKnight in violation of the Odometer Act because they rolled back the miles on the odometer prior to executing the LPA contract with Mr. McKnight and prior to assigning him the LPA Vehicle.

102.    Under the ICOA and LPA, CRST Lincoln and CRST Transportation

23

required Mr. McKnight to purchase Non-Trucking Liability Insurance from their sister company, Great Plains Casualty, Inc. The premium amount and the designated administrative fee for this product were set by CRST Transportation and CRST Lincoln at the rate of $38.00 per month until the $348.00 yearly premium was paid plus Defendants' markup. Mr. McKnight was routinely overcharged.

103.   Defendants required Mr. McKnight to pay additional rent to fund a comprehensive maintenance program for which he never received a benefit.

104.   After executing Defendants' agreements, Mr. McKnight learned he was paying $.15 per mile into a comprehensive guaranteed maintenance program that did not exist.

105.   CRST Transportation required Mr. McKnight to purchase his equipment for $3,722.13 such that it charged him at least $75.00 per week.

106.   Defendants took $2,000.00 from McKnight's compensation to fund a "General Escrow Fund" which CRST Transportation also held and controlled. CRST Transportation funded this by deducting $25.00 per week from McKnight's pay.

107.   Defendants also required Mr. McKnight to fund a "Maintenance and Other" reserve fund in addition to the comprehensive maintenance plan. This escrow account was held, managed, and controlled by CRST Transportation.

108.   Under the ICOA, Defendants required Mr. McKnight to fund an

additional tax/title/permit/license escrow account at the rate of $179.83 per month and/or week. This escrow account was held, managed, and controlled by CRST Transportation.

109. Even though CRST Transportation deemed Mr. McKnight an independent contractor, they required him to purchase occupational accident insurance through their approved entity totaling $1,953.00 plus administrative fees paid to CRST Transportation. The cost for this deduction was set to offset the cost CRST Transportation paid for its company drivers.

110. CRST Lincoln and CRST Transportation required Mr. McKnight to purchase physical damage insurance totaling at least $4,687.76 ($90.14 per week) which included a .5% markup charged by CRST Transportation for offering this forced service.

111. Mr. McKnight routinely paid his lease purchase payments and deductions and never defaulted under the ICOA or LPA.

112. At the end of 2022 through the first quarter of 2023, CRST changed payment systems which extended the times Defendants paid McKnight. The new system caused Mr. McKnight to incur a deficit because he was not receiving timely payments.

113. Mr. McKnight complained. CRST Transportation never addressed his

complaints but told Mr. McKnight he owed them for overstated fuel payments. Mr. McKnight requested documentation but none was provided. Without notice, Defendants began deducting money each week to repay themselves the alleged deficit.

114. At the same time, CRST Transportation began assigning Mr. McKnight loads that failed to cover his standard deductions.

115. On February 5, 2023, McKnight turned in his truck because CRST Transportation's following actions: reducing payment for the loads McKnight was required to haul; reducing McKnight's compensation by reducing the line haul percentage owed; by making repeated deductions for chargebacks in excess of the actual costs; by failing to timely pay McKnight; and by deducting additional funds from McKnight's compensation for the alleged overpayments.

116. Prior to relinguishing his LPA Vehicle, Mr. McKnight traveled to Defendants' Iowa hub and complained about the overcharging, delayed payments, and bad loads, but Defendants refused to address any of them.

117. At the same time, Defendants refused to allow Mr. McKnight the right to use his LPA vehicle to haul loads for himself independently or for other motor carriers.

118. After turning in his LPA Vehicle, McKnight continued to call CRST

26

Transportation with requests for payments concerning all of his escrowed funds and his final paycheck. Defendants ignored Mr. McKnight's requests.

119. When Mr. McKnight relinquished his LPA Vehicle, it was DOT compliant.

120. Nonetheless, CRST Transportation and CRST Lincoln charged Mr. McKnight for another DOT inspection, comprehensive maintenance, and nefarious items in order to confiscate and convert all of Mr. McKnight's funds escrowed with CRST Transportation and his final check. The subject vehicle did not require any preventative maintenance.

121. Defendants also continued to charge Mr. McKnight for standard deductions and for a vehicle he no longer possessed well into April 2023 on contracts Defendants terminated in February 2023.

122. When CRST Transportation took possession of Mr. McKnight's lease-purchase subject vehicle, Mr. McKnight had approximately $2,000.00 in his "Performance Bond/General Escrow" account, $5,463.52 in his toll/tax/license/permit escrow, and paid over $12,082.20 in the "comprehensive maintenance program," and hundreds into his "Maintenance Escrow Reserve Fund" escrow fund account.

123. CRST Transportation also refused to pay Mr. McKnight's final paycheck totaling $3,560.87.

27

124. By the end of February 2023, Mr. McKnight had paid over $19,530.00 in lease-purchase payments to CRST Transportation and CRST Lincoln over the course of 42 weekly payments.

125. Defendants sold or released Mr. McKnight's LPA Vehicle without providing him credit for the same.

126. As a result of Defendants' actions and inaction, Mr. McKnight has been damaged and continues to be damaged.

**Plaintiff Wolf's Specific Facts:**

127. Since October 2011, Mr. Wolf has worked for CRST Transportation and CRST Lincoln as a lease-purchase "owner"- operator.

128. Mr. Wolf has signed numerous LPAs and ICOAs with CRST Transportation and CRST Lincoln to maintain his employment.

129. Defendants required Mr. Wolf to execute (1) an Independent Carrier Operator Agreement (ICOA) with CRST Transportation and (2) a Lease Purchase Agreement (LPA) with CRST Lincoln. The LPA/ICOA relevant to this action concern Units W768FM, 616975; W349ZM; and 104518.

130. At all times prior to signing the LPA, Defendants represented to Mr. Wolf that he was receiving an efficient and well-maintained vehicle.

131. For each LPA Vehicle, Defendants assured him it was in great condition.

28

Despite such assurances, Defendants never provided any government disclosures or logs concerning the vehicle's history, vehicle logs, condition reports, work repair history, or mileage before they assigned the LPA Vehicle to Mr. Wolf.

132. For LPA Vehicles W768FM, 616975; W349ZM; and 104518, CRST Transportation misrepresented the maintenance history to induce Mr. Wolf's performance and acceptance of each vehicle.

**Unit W768FM**:

133. On November 23, 2021, Mr. Wolf signed CRST Transportation's ICOA and CRST Lincoln's LPA for Unit W768FM and he drove unit W768FM until he could no longer afford the repairs. He sold it for a loss in 2022.

134. Mr. Wolf started having issues with W768FM in January 2022 while transporting Defendants' loads to Georgia.

135. For Unit W768FM, CRST Transportation deducted $525 per week from Wolf's compensation and represented to Mr. Wolf the payments were for additional principal and the maintenance program. However, CRST Transportation kept these monies for itself by claiming the deducted funds were additional rent for a maintenance program. Mr. Wolf received no benefit for this deduction.

136. Mr. Wolf requested a substitute vehicle in accordance with his LPA/ICOA, but Defendants refused to provide one despite the LPA/ICOA terms.

29

137.   In February 2022, LPA Vehicle W768FM was released from the shop and it broke down before Wolf arrived at Defendants' customer. As a result, Wolf headed back to the shop and learned CRST Transportation had frozen his accounts because he did not pick up the load. The freeze prevented Wolf's ability to return to the shop and or access his escrowed funds for needed repairs.

138.   The designated facility informed Wolf that the one-box device was broken and needed to be replaced for the amount of $12,000-$15,000 for labor. Wolf had not choice to agree to the repair and Defendants refused to provide any escrowed funds for the repair.

139.   Weeks later, the same issue caused W768FM to break down again.

140.   Wolf immediately informed CRST Transportation and requested assistance as allowed under the ICOA. All assistance is denied. Instead, CRST Transportation instructed Wolf to haul a customer's load on a truck that was not working properly.

141.   Fearing termination, Wolf runs the load and before having the MCM device repaired.

142.   In March 2022, Defendants instruct Wolf to return the Georgia shop because the one-box was the source of all the breakdowns.

143.   CRST Transportation does not offer any maintenance program

30

assistance. Instead, Mr. Wolf is required to empty all escrowed funds to fix the truck even though he was paying CRST additional rent for a maintenance program. CRST Transportation then informs Mr. Wolf about a new deficit they claim he owed. Wolf disagrees with the new charges and CRST tells him he needs to sign a new lease to keep running and to prevent any default. Wolf was not allowed to continue using LPA Vehicle W768FM because of the required repairs.

144.   With no other options, Mr. Wolf signed a new lease purchase agreement for Unit 616975 which Defendants selected for him. Defendants did not tell Wolf the unit was down for substantial repairs. CRST refuses to roll over Mr. Wolf's accrued funds and accounts and he is required to start anew. CRST charges Wolf for an additional round of setup costs.

**Unit 616975**

145.   On April 19, 2022, Mr. Wolf signed CRST Transportation's ICOA and CRST Lincoln's LPA for Unit 616975 and he drove it until August 2022 when he could no longer afford the repairs. Wolf was required to return the unit to CRST, losing all equity invested in the truck because CRST refused to credit Mr. Wolf for the same. CRST re-leased Unit 616975 without ever providing credit to Mr. Wolf.

146.   After learning about the unit's troubled maintenance history, Wolf tried to stop the sale of his prior truck W768FM , but its new owner had already picked up

the truck.

147.    CRST Transportation did not inform Mr. Wolf when he signed the second LPA/ICOA for Unit 616975 that it was down for substantial repairs.

148.    Unit 616975 was a lemon from the start. Wolf complained for months that the truck was riddled with issues and he requests a substitute vehicle.

149.    At the same time, CRST was forcing Mr. Wolf to pay for a comprehensive maintenance program but not allowing him any comprehensive maintenance repairs for 616975.

150.    Mr. Wolf drove the unit 616975 for four months. CRST Transportation refuses to pay for maintenance despite charging him for the program and instructs Mr. Wolf to sign another lease purchase agreement for Unit W349ZM.

151.    At this point, Wolf had emptied his savings, maintenance, and escrow accounts because CRST refused to assign him a substitute vehicle while his initial LPA Vehicles were down for repairs. CRST also refused to pay for any maintenance items despite its agreement to cover the same.

**Unit W349ZM:**

152.    Knowing he was in the red, Mr. Wolf agreed to accept Unit 349ZM and signs the LPA/ICOA on August 26, 2022.

153.    In a matter of days, Unit 349ZM's one-box system fails. His new LPA

32

truck was down for weeks and this caused Wolf to be further debt because CRST refused to provide a substitute vehicle.

154. CRST Transportation sent Wolf a settlement sheet showing he owed them $32,570.49 for unpaid repair bills for the prior units. Prior to filing this action, Mr. Wolf learned the $32,570.49 maintenance bill was more than 100% of the actual repair bill issued by the shop.

155. Mr. Wolf notified CRST Transportation of the improper billing. Nonetheless, CRST Transportation deducted payments for repair costs Mr. Wolf did not owe or authorize.

156. Mr. Wolf continued driving for CRST because he needed to make a living for himself and his family.

157. The one-box Defendants installed in Unit W349ZM's one-box failed again on or about February 16, 2024 and Defendants refused to pay for the repairs. Unit 349ZM was towed to Freightliner in Nampa, Idaho. Upon inspection, Freightliner informed Wolf that Defendants had installed a bad one-box unit.

**UNIT 104518:**

158. CRST refused to provide a substitute vehicle while Unit W349ZM was being repaired. Defendants required Mr. Wolf to execute another lease with their equipment company, CRST Equipment Solutions, Inc., for Unit 104518 in order for

33

Mr. Wolf to remain employed under the ICOA.

159.    In addition to deducting lease purchase payments for each LPA Vehicle, CRST Transportation also deducted "additional rent" payments from Wolf's compensation for Units 616975 and 349ZM while representing to Mr. Wolf the payments were for additional principal for his own use. Mr. Wolf has never received the benefit of these additional funds Defendants deducted from his compensation.

160.    Under the ICOA and LPA, Defendants required Mr. Wolf to purchase Non-Trucking Liability, bobtail, physical damage, occupation, and worker's compensation insurance from their sister company, Great Plains Casualty, Inc., amongst others.  The weekly premium amounts and fee charged for each policy was set by Defendants. Mr. Wolf was routinely overcharged for the cost of the stated coverage amount.

161.    Neither CRST Transportation nor CRST Lincoln are licensed to sell  or procure insurance.

162.    Defendants unlawfully profited from the sale of insurance to Mr. Wolf.

163.    Upon information and belief, the prices for all standard deductions Defendants made against Wolf's compensation since November 2021 exceeded their actual cost in violation of the truth-in-leasing regulations.

164.    Defendants have never disclosed the actual cost for each deduction or

the markup they required Wolf to pay. Mr. Wolf routinely paid his lease purchase payments and deductions and never defaulted under the ICOA or LPA.

165.    At the end of 2022 through the first quarter of 2023, CRST changed payment systems and how/when it compensated its LPA and ICOA drivers, including Wolf.

166.    Mr. Wolf incurred a deficit due to Defendants delaying payment and he complained to CRST Transportation, but nothing was done.

167.    Defendants responded to Wolf's complaints by sending him a notice stating that Defendants overpaid him for fuel discounts. At the same time, CRST Transportation started deducting at least $103.31 from Wolf's compensation without notice. Mr. Wolf requested documentation for the new repayment deductions but no documents were provided. Wolf never authorized this deduction.

168.    At all relevant times, CRST Transportation refused to allow Mr. Wolf to use his LPA Vehicle to haul loads for himself or other motor carriers when CRST Transportation does not offer loads which cover Mr. Wolf's costs.

169.    Since May 2021, CRST reduced the line haul percentage payments owed to Mr. Wolf by changing the rate amounts after he picks up a customer's load.

170.    Upon information and belief, CRST Transportation has also paid Mr. Wolf a line haul percentage less than the 75% owed for each load hauled.

35

171. Mr. Wolf currently works for Defendants as an ICOA driver and he was apprehensive about filing the action because he fears he may be retaliated against.

172. As a result of Defendants' actions and inaction, Mr. Wolf has been damaged and continues to be damaged.

**Plaintiff McCain's Specific Facts**

173. Similar to Wolf and McKnight, Mr. McCain also lease purchased his vehicle through CRST Lincoln Sales and entered into an Independent Contractor Operating Agreement with CRST Transportation within the meaning of 49 C.F.R. § 376.2(e) on February 20, 2022 for Unit No. 104199 ("LPA Vehicle").

174. The LPA and ICOA executed by McCain are substantially the same in all respects as the LPAs and ICOAs executed by McKnight, Wolf, Crutchfield.

175. The LPA and ICOA operate as one agreement and both fail to meet the requirements of 49 C.F.R. §376.12 in that a number of provisions required by that regulation are missing from the agreements and a number of provisions included in the agreements are in conflict with that regulation.

176. Pursuant to the LPA and ICOA, the Defendants required Mr. McCain to obtain various types of insurance coverage and deducted the premium amounts for each from McCain's weekly and periodic compensation.

177. In addition to the LPA's weekly cost of $599.00, CRST Lincoln's LPA

and CRST Transportation's ICOA authorized deductions from Plaintiff McCain's compensation for insurance and the standard deductions owed.

178. CRST Transportation and CRST Lincoln set the premium costs for each insurance product they required Mr. McCain to purchase from their sister company, Great Plains Casualty, Inc.

179. Defendants are not licensed to sell or procure insurance. However, Defendants set the premiums for each type of insurance McCain purchased.

180. Defendants unlawfully profited from the sale of insurance without a license because the premiums payments Defendants deducted from McCain exceeded the cost of the coverage provided. Defendants also placed a $3,500.00 deficit on his settlement and claimed it was a deficit on his account. He questioned what the deficit amount was for and requested documents for the same but none were provided.

181. Defendants failed to provide policies and certificates of insurance to Mr. McCain for each type of insurance he purchased in accordance with 49 C.F.R. §376.12 (h)-(j). The documentation Defendants provided to Mr. McCain concerning the insurance did not satisfy 49 C.F.R. §376.12(j)(2) because it did not show the actual cost for the stated coverage.

182. Mr. McCain operated his LPA Vehicle until it suffered a mechanical failure in April 2022 due to overheating this should have been covered by the

37

maintenance program, but CRST refused.

183. The truck remained down for over four months, during which time Defendants refused to provide Mr. McCain a substitute vehicle required by their contracts. When he received the truck again, it continued to break down over several months.

184. At all relevant times, Mr. McCain was paying additional rent to participate in Defendants' comprehensive maintenance program. Despite receiving Mr. McCain's funds, Defendants refused to cover the repairs the LPA Vehicle required.

185. Every week Defendants continued to charge Mr. McCain for standard deductions for an LPA Vehicle he was unable to use.

186. Mr. McCain requested the supporting documentation for all charges Defendants made against his compensation because he was not able to haul loads while his LPA Vehicle remained down for repairs.

187. Mr. McCain wanted to verify all charges against his compensation.

188. When McCain picked up his LPA Vehicle in May 2022, he was told the repair bill would be processed through CRST Transportation.

189. McCain learned when he received his next settlement statement that CRST had double billed him for the work performed on his LPA Vehicle.

190. Mr. McCain asked Defendants' managers to provide documentation that the maintenance expense CRST Transportation claimed he owed was more than double the actual cost incurred for the repair his LPA Vehicle required. No documentation was provided.

191. At all times, the amounts deducted by Defendants from McCain's compensation for the standard deductions, maintenance bills, and insurance products were substantially greater than the costs Defendants paid for each on McCain's behalf.

192. At all relevant times, Mr. McCain was to receive 75% of the line haul percentage to paid by the customer to CRST.

193. Throughout his employment, Mr. McCain also asked CRST Transportation to produce rated freight bills and rate confirmation sheets in order to ensure he was receiving the full line haul percentage pay owed.

194. CRST Transportation refused to provide any documentation other than its pay settlement statement.

195. Upon information and belief, CRST Transportation paid Mr. McCain a line haul percentage less than the actual amount Mr. McCain was entitled to receive.

196. In addition to charging him double the cost to repair the overheating issues, CRST Transportation was forcing Mr. McCain to pay for a comprehensive

maintenance program but not allowing him any comprehensive maintenance repairs for his LPA Vehicle. Mr. McCain is entitled to the return of these funds.

197. Mr. McCain routinely paid his lease purchase payments and deductions and never defaulted under the ICOA or LPA.

198. Until December 2022, Mr. McCain continued to haul loads for Defendants. However, the loads Defendants assigned him did not cover his expenses due to Defendants' delaying his payments, overcharging for maintenance, and the cost of excessive deductions. In addition, Defendants charged him for the shop fees incurred which should have been covered by the maintenance program totaling at least an $8,200.00 deficit as of December 2. Approximately 20 days after Mr. McCain turned the truck in, Defendants sent him a bill for over $9,000.00 and claimed they had taken all funds escrowed with Defendants.

199. At all relevant times, CRST Transportation refused to allow Mr. McCain to use his LPA Vehicle to haul loads for himself or other motor carriers when CRST Transportation does not offer loads which cover Mr. McCain's costs.

200. As a result, Mr. McCain continued to fall further and further behind financially to the point he decided to turn his LPA Vehicle in on December 8, 2022.

201. On December 8, 2022, Mr. McCain turned in his DOT compliant LPA Vehicle and the trailer he was renting from CRST Transportation by delivering each

40

to Defendants' Dallas shop in Hutchins, Texas. He left his keys with Defendants' shop staff and sent documentation of the delivery to Joey Malone and Stephen Lutz, among others.

202. Defendants' failure to provide a substitute vehicle, failure to pay the maintenance, overcharging for deductions, and failure to pay the full line haul percentage owed damaged and continues to damage Mr. McCain.

203. As a result of Defendants' actions, Mr. McCain lost his livelihood and the ability to successfully provide for his family.

**James Crutchfield's Specific Facts**

204. On November 1, 2019, Mr. Crutchfield entered into an Independent Contractor Operating Agreement with CRST Malone, Inc., but he did not execute an LPA to lease purchase a vehicle.

205. For the first couple of years, Mr. Crutchfield operated without issue while driving for CRST Malone, Inc.

206. In April 2021, CRST Expedited, Inc. restructured all the companies in the CRST enterprise, including CRST Malone, Inc. On or about April 1, 2021, CRST Malone, Inc. assigned all rights and obligations owed under Mr. Crutchfield's ICOA to its parent company CRST Expedited, Inc. d/b/a CRST Transportation, Inc.

207. An addendum concerning the same was issued to Mr. Crutchfield which

renewed the terms of the ICOA in May 2021. Other than the assignment to CRST Transportation, the terms of Crutchfield's ICOA remained unchanged.

208.   Mr. Crutchfield operated under the ICOA with CRST Transportation until he resigned on or about August 21, 2023, after CRST Transportation made a series of unlawful deductions from his escrow accounts and compensation.

209.   Despite owning his vehicle, CRST required Mr. Crutchfield to execute a sublease agreement and it charged him lease payments unbeknownst to him.

210.   Mr. Crutchfield's ICOA is substantially the same as all other Plaintiffs.

211.   The Sublease and ICOA operate as one agreement and both failed to meet the requirements of 49 C.F.R. §376.12 in that a number of provisions required by that regulation are missing from the agreements and a number of provisions included in the agreements are in conflict with that regulation.

212.   In order to become CRST's ICOA driver, Mr. Crutchfield was required to purchase insurance, tags, licenses, titles, and permits through CRST Transportation based on the rates CRST stated Mr. Crutchfield owed for each.

213.   At all times, Mr. Crutchfield was also required to contribute a flat rate of $500.00 per week to a maintenance account and other reserve fund escrow which was controlled and managed by CRST Transportation. Mr. Crutchfield authorized an increase for this escrow to $1,000.00 per week in 2023.

42

214. Per the ICOA, CRST also deducted money for the security deposit/bond escrow, IFTA Permit, tag, toll escrow, and general escrow account based on rates set by CRST Transportation. At all times, Defendants represented that all of Mr. Crutchfield's escrowed funds belong to Mr. Crutchfield.

215. The standard deductions and charge backs CRST Transportation required Mr. Crutchfield to pay as an ICOA driver included but were not limited to the following: road use escrow, bobtail insurance, clearing account, FB Equipment insurance, physical damage insurance, liability insurance, Lic/Permit, maintenance and other reserve escrow fund, security deposit deduction, pre-pass insurance, pass authorization, qualcom net-charges, fuel tax, True N insurance, lease payment deduction, inspection fees.

216. The amounts deducted by Defendants from Mr. Crutchfield's compensation for the standard deductions, maintenance bills, and insurance products were substantially greater than the costs CRST Transportation paid for each.

217. Pursuant to the Sublease and ICOA, Defendants required Mr. Crutchfield to obtain equipment, trailer, physical damage, bobtail insurance from is affiliate and sister company, Great Plains Casualty Company.

218. CRST Transportation set the premium amounts for all insurance deductions and unlawfully profited from the sale insurance without a license.

43

219. Like other Plaintiffs, CRST Transportation deducted the premium amounts for each insurance policy from Mr. Crutchfield's weekly and periodic compensation and paid the same to Great Plains.

220. Defendants never provided certificates of insurance, documentation concerning the set premiums, or the policies to Mr. Crutchfield which is required under 49 C.F.R. §376.12 (h)-(j) and the information provided did not satisfy the requirements of 49 C.F.R. §376.12(j)(2).

221. In the middle of January 2023, Mr. Crutchfield requested supporting documentation for all deductions and charge backs CRST Transportation made against his compensation, but CRST refused to produce the same.

222. CRST Transportation told Mr. Crutchfield he was only allowed to receive the settlement statements and CRST Transportation has never provided supporting documentation for any deductions it made against Mr. Crutchfield's compensation.

223. CRST Transportation changed its billing software during the first quarter of 2023 and Mr. Crutchfield learned about the change because CRST failed to timely pay him his detention pay, fuel surcharge compensation, and line haul percentage for almost a month.

224. On or about February 2023, Mr. Crutchfield complained about CRST

44

Transportation's payments being late and he was told the issues were caused by the new system, but payment was not delivered.

225. CRST Transportation's failure to timely pay Mr. Crutchfield caused Mr. Crutchfield to get further behind on his payments owed to CRST.

226. CRST continued to delay payment to Mr. Crutchfield well after loads were hauled in violation of the agreements and regulations.

227. In April 2023, Mr. Crutchfield complained again to CRST Transportation because their delayed payments made him incur a deficit.

228. There were multiple months in 2023 where Mr. Crutchfield loaned himself money from his escrow account to ensure he never defaulted. Toward the end of April 2023, Mr. Crutchfield learned that CRST Transportation was charging him for the loans he gave himself. CRST Transportation tacked the excess charges onto the ever-growing deficit.

229. Once again, Mr. Crutchfield complained to CRST about the unauthorized transactions and he demanded documentation for each.

230. CRST Transportation refused to provide any documentation and they refused to refund the money.

231. Instead, CRST Transportation sent Mr. Crutchfield a letter in May 2023 alleging that he owed $5,937.75 for overpaid fuel discounts.

232. CRST began automatically deducting monies from Mr. Crutchfield's weekly compensation and escrowed funds to repay the demanded amount without notice to or approval from Crutchfield.

233. In response, Mr. Crutchfield demanded all supporting documentation for each overpayment, but no documentation showing an accounting of each overpayment was provided to Mr. Crutchfield.

234. Mr. Crutchfield did not authorize any additional deductions and demanded CRST stop withdrawing monies for the alleged overpayment until they could prove he owed the money, but CRST Transportation refused.

235. The unlawful deductions created an additional deficit. Mr. Crutchfield felt like he was being retaliated against by CRST Transportation because he requested supporting documentation for all charge backs made against his compensation.

236. CRST Transportation unilaterally took money out of Mr. Crutchfield's maintenance and reserve escrow account without his approval and charged him for using his own funds.

237. CRST Transportation's pattern and practice of making unlawful deductions against Mr. Crutchfield's compensation continued through the end of August 2023.

238. During the second week of August 2023, Mr. Crutchfield saw CRST

46

deduct thousands of dollars from his escrow accounts and charged him for taking loans from his own escrowed funds. Mr. Crutchfield complained.

239. CRST Transportation told Mr. Crutchfield he was in arrears and that it was allowed to take funds from the accounts as payment toward the arrears.

240. Mr. Crutchfield provided CRST Transportation two weeks' notice that he was terminating his ICOA.

241. Mr. Crutchfield traveled to Defendants' terminal in Blytheville, AR, and resigned on August 21, 2023. He asked for supporting documents for arrears CRST claimed he owed. CRST Transportation accepted his resignation but refused to provide the requested information.

242. To date, CRST Transportation never paid Mr. Crutchfield all interest owed on the funds it collected for the multiple escrow accounts.

243. Once Mr. Crutchfield resigned, CRST Transportation refused to return all of Mr. Crutchfield's escrowed funds or repay him for the unlawful deductions.

244. Mr. Crutchfield was to receive 75% of the line haul percentage paid by the customer to CRST. Throughout his employment, Mr. Crutchfield requested rated freight bills and rate confirmation to check his pay, but Defendants refused.

245. Upon information and belief, CRST Transportation knowingly failed to pay Mr. Crutchfield the full line haul percentage payment owed on multiple occasions

47

since April 2021 and it refused to provide the documents upon request.

246.    Despite owning his own vehicle, CRST Transportation unlawfully charged Mr. Crutchfield for lease purchase payments.

247.    At all relevant times, CRST Transportation refused to allow Mr. Crutchfield to use his LPA Vehicle to haul loads for himself or other motor carriers when CRST Transportation did not offer loads which covered Mr. Crutchfield's costs.

248.    Mr. Crutchfield has been damaged by CRST Transportation unlawfully reducing his compensation, confiscation of his escrowed funds, failure to pay interest on all escrowed funds, failing to pay him the full line haul percentage owed based on payments received from customers, and by CRST making repeated unauthorized deductions from his escrow accounts.

## COUNT I
## VIOLATION OF FEDERAL TRUTH IN LEASING
## 49 U.S.C. § 14704(a)(2) and 49 C.F.R. §§ 376.12 et. seq.

Plaintiffs re-allege and incorporate the facts alleged in the previous fact paragraphs 16-248 and make them a part hereof:

249.    Title 49 U.S.C. § 14704(a)(2) creates a right of action for damages arising from authorized carriers' violation of the Motor Carrier Act and the Federal Truth in Leasing regulations.

48

250. CRST Transportation as an "authorized carrier" entered into an ICOA with Plaintiffs, as "owner," to hire their services and equipment that CRST Transportation did not own. The ICOA with CRST Transportation and LPA agreement with CRST Lincoln included many required provisions mandated by 49 C.F.R. § 376.12.

251. CRST Lincoln entered into an LPA with Messrs. McKnight, McCain, and Wolf.

252. Under federal law, an "authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: . . . [t]here shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.12."

253. CRST Transportation engaged in the unlawful provision of transportation services in equipment it does not own because it failed to conform to provisions required by 49 C.F.R. Part 376 and included in the ICOA and LPA which governed its use of Plaintiffs' equipment and services.

254. At all relevant times, CRST Lincoln assigned its rights under the LPA to its sister company, CRST Transportation, for McKnight, Wolf, and McCain.

255. CRST Transportation failed to abide by multiple requirements within its LPAs and ICOAs with Plaintiffs and which were mandated by statute under the

49

applicable regulations, to wit:

A.    49 C.F.R. § 376.12(I) requires that the LPA and ICOA standard lease  specify the terms of any agreement in which an owner-operator purchases or rents equipment which gives the carrier the right to make deductions from compensation for the purchase or rental payments. As the lender CRST Lincoln, the LPA assigned and authorized such rights to CRST Transportation as Lessor.  CRST Transportation deducted the weekly installment payments and fees for such agreements from the Plaintiffs' compensation but has failed to account for those.

B.    49 C.F.R. § 376.12(h) requires that the LPA and ICOA standard lease to "clearly specify all items that may be initially paid for by the authorized carrier, but deducted from the lessor's compensation . . . together with a recitation as to how the amount of each item is to be computed." Additionally, the regulation mandates that the owner-operator "shall be afforded copies of those documents which are necessary to determine the "va1idity of the charge." CRST Transportation and CRST Lincoln deducted numerous charges from Plaintiffs' pay settlements but failed to provide them  documents from which they could check the validity of the charges or documentation showing the actual cost incurred by Defendants for each charge. Defendant failed to provide documentation to support its markups or administrative fees or disclose the same to Plaintiffs.  Those include charges for occupation insurance and insurance products together with an administrative fee that provides no coverage to Plaintiffs, as well as insurance premiums on the truck with no documentation to validate the charges.

C.    49 C.F.R. § 376.2(k)(4) requires that the ICOA specify that the owner-operator has the right to demand an accounting at any time for transactions involving escrow funds that the carrier controls. CRST Transportation failed to provide an accounting despite the regulation requirements included in the LPA and ICOA.  Not only has there been no accounting for these funds, when CRST Transportation improperly terminated its agreements or forced the termination thereof and  kept the balance of McCain's, McKnight's, and Crutchfield's maintenance plan

50

account payments and Crutchfield's maintenance and general escrow account.

D.     49 C.F.R. § 376. 12(k)(5) requires the lease to specify that the motor carrier shall pay the owner-operator interest on escrow funds the carrier controls on at least a quarterly basis, and must calculate the interest pursuant to a prescribed method. CRST Transportation while consistently collecting these escrow funds failed to pay interest to Plaintiffs on all bonds, deposits, and escrow funds or to account for those despite the regulation requirements included in the LPA and ICOA.

E.     49 C.F. R. § 376. l2(k)(6) requires the lease to specify that at the time of return of escrow funds; the carrier may make deductions from escrow funds for those obligations incurred by the owner-operator which have been previously specified in the lease. CRST Transportation failed to return Plaintiffs escrow funds despite the regulation requirements included in the LPA and ICOA.

F.     49 C.F.R. § 376. l 2(k)(3) requires the lease to specify that the carrier will provide an accounting to the owner-operator of any transactions involving escrow funds under the carrier's control by either of two prescribed methods. CRST Transportation and CRST Lincoln failed to abide by this regulation included in the LPA and ICOA.

G.     49 C.F.R. § 376.12(h) requires the lease to "clearly specify all items that may be initially paid for by the authorized carrier, but deducted from the lessor's compensation . . . together with a recitation as to how the amount of each item is to be computed." Additionally, this regulation mandates that Plaintiffs as the lease purchase and/or owner-operator "shall be afforded copies of those documents which are necessary to determine the validity of the charge." CRST Transportation and CRST Lincoln failed to abide by this regulation included in the LPA and ICOA while making numerous deductions from Plaintiffs' earnings. In further violation of this regulation, CRST Lincoln and CRST Transportation forced placed insurance on Plaintiffs whereby Defendants set the premium amount and admin fee for each insurance

51

product the Plaintiffs were required to purchase from their affiliate and/or sister company Great Plains Casualty Insurance Co without a license to do so. Defendants unlawfully profited from the sale of forced placed insurance to Plaintiffs and did not disclose the markup.

H.  49 C.F.R. § 376. 12(j)(3) requires the lease to specify that the authorized carrier will provide the lessor with a written explanation and itemization of any deductions for cargo or property damage made from any compensation of money owed to the lessor. The written explanation and itemization must be delivered to the lessor before any deductions are made. CRST Transportation and CRST Lincoln failed to abide by this regulation which is also required by the LPA and ICOA because they deducted monies from Plaintiffs' compensation for maintenance, loan fees, admin fees, and chargebacks that were not approved for by Plaintiffs.

I.  49 C.F.R. § 376.12(g) requires that "the lease must permit Plaintiffs the ability to examine copies of the motor carrier's tariff and other documents upon which its rates are calculated. Despite repeated requests, CRST Transportation and CRST Lincoln jointly and separately failed to provide freight bills and other documents upon which its rates are based and has failed to abide by this regulation which is also required by the LPA and ICOA. Doing so allowed CRST Transportation to unlawfully profit from the work Plaintiffs performed on its behalf from April 2021 to the present. Instead of providing the supporting documents, Defendants manufactured its own internal documents called pay settlement statements which represented to Plaintiffs that CRST Transportation was allegedly receiving less money from its customer than actual received. In turn, CRST pocketed the difference at the expense of each Plaintiffs.

J.  CRST Lincoln and CRST Transportation unlawfully reduced Plaintiffs' compensation for deducting additional rent for a lease purchase vehicle he was already paying a lease payment for. This is a violation of Truth in Leasing.

K.  CRST Lincoln and CRST Transportation CRST Lincoln and

52

CRST Transportation violated the motor carrier act and the truth in leasing regulations by charging Plaintiffs additional rent for a comprehensive maintenance program for which Plaintiffs never received the benefit of. This is a clear violation of the Act and regulations.

256. CRST Transportation agreed to pay Plaintiffs seventy-five percent (75%) of the Adjusted Gross Revenue, as defined, which it billed to the shipper. (ICOA §§ 3.2(i-iv)). Despite this, CRST Transportation failed to pay each Plaintiff in accordance with this agreement from April 2021 to the present.

257. CRST Transportation did not pay Plaintiffs for all incentives to which they were entitled while driving as CRST Transportation's lease-purchase owner-operator. The unpaid incentives include, but are not limited to, fuel surcharges, tarp pay, load and unloading incentives, retention, or waiting incentives.

258. Crutchfield, McCain, and McKnight never received their final paycheck after Defendants terminated their agreements.

259. CRST Transportation, upon information and belief, and in violation of its agreement and the truth-in-leasing regulations, had a pattern and practice of understating the gross revenue it actually received from shipper on Plaintiffs' settlement statements before it calculated the compensation due to Plaintiffs. By reporting to Plaintiffs a reduced amount in adjusted gross revenue billed to the shipper, CRST Transportation underpaid Plaintiffs by reducing the line-haul

53

percentage owed.

260. Upon information and belief, CRST Transportation maintains standing contracts with its customers to ensure standard rate payments for the company for given routes. Despite this, Plaintiffs never received rate confirmation documentation to verify the rates paid by customers to CRST Transportation.

261. On more than one occasion, Defendants unilaterally reduced payments to Plaintiffs after Plaintiffs had accepted and loaded a given load. Plaintiffs were not informed of the reduction prior to accepting the loads and they learned about the reduction when they received their pay settlement statements.

262. For Plaintiffs who were forced to return their LPA Vehicle, Defendants made repeated unlawful compensation concerning costs, additional rent, maintenance, insurance, etc. The deductions Defendants charged against Plaintiffs compensation after possession and termination of the ICOA/LPA were unlawful and the monies are due to be accounted for and returned to Plaintiffs.

263. CRST Transportation's ICOA and CRST Lincoln's standard lease purchase agreement with Plaintiffs McKnight, Crutchfield, and McCain also failed to comply with 49 C.F.R. § 376.12:

1. ICOA and LPA did not disclose the amount deducted from Plaintiffs' compensation that exceeded the actual cost of the items initially paid for by CRST Transportation or CRST Lincoln, and did not

54

disclose how these deductions from compensation were calculated, all in violation of 49 C.F.R. §376.12 (h);

2.     The ICOA and LPA did not specify with particularity the items for which Plaintiffs' escrow could be used, nor was its control of the funds limited as required by 49 C.F.R. § 376.12 (k).

3.     The LPA charged Plaintiffs additional money for a comprehensive maintenance program and Defendants labeled this deduction "additional rent." However, Defendants declined Plaintiffs repeated maintenance and service requests for their respective LPA Vehicle from April 2021 through the present.

4.     When Defendants took possession of the LPA Vehicles from McCain, Wolf, and McKnight, Defendants quickly charged each for multiple maintenance line items in order to wipe out the funds Plaintiffs had entrusted to Defendants during their employment.

264.   From April 6, 2022 through February 5, 2023, CRST Transportation and CRST Lincoln deducted at least 42 lease purchase payments of $465.00 per week, totaling $19,530.00 from McKnight's compensation.  In addition to these payments, CRST Transportation also deducted fees for device charges, securement purchase payments, auxiliary equipment purchase, occupational insurance, administrative fees, premiums for all insurance services CRST Transportation required McKnight to purchase and other equipment rentals.

265.   From February 2022 through December 8, 2022, CRST Transportation and CRST Lincoln deducted at least 41 lease purchase payments of $599.00 per week, totaling $24,730.14 from McCain's compensation.  In addition to these

payments, CRST Transportation also deducted from McCain's compensation fees for device charges, securement purchase payments, auxiliary equipment purchase, occupational insurance, administrative fees, maintenance program, premiums for all insurance services and other equipment rentals.

266. CRST Transportation deducted over $7,000.00 in lease purchase payments from Crutchfield despite the fact he owned his own vehicle. These charges were in addition to CRST Transportation's standard deductions for device charges, securement purchase payments, auxiliary equipment purchase, occupational insurance, escrow accounts, maintenance account, administrative fees, premiums for all insurance services and equipment rentals.

267. Since 2022, CRST Transportation has charged Wolf well over $45,000.00 in LPA Payments and Maintenance costs in addition to the standard deductions taken from his compensation. Mr. Wolf was charged double for maintenance costs while paying CRST Transportation to participate in its comprehensive guaranteed maintenance program for each LPA Vehicle he was required to purchase to remain employed as CRST Transportation's ICOA driver.

268. CRST Transportation and CRST Lincoln worked in concert to make repeated deductions from Plaintiffs' compensation in violation of the regulations and agreements. Plaintiffs performed all obligations required of them under the ICOA

56

standard lease and the LPA.

269.   The federal leasing regulations provide that when a motor carrier like CRST Transportation and its lending arm CRST Lincoln require the escrowing of funds by a lease-purchase/owner-operator such as Plaintiffs, then the motor carrier must provide an accounting of the escrowed funds on a monthly basis and pay interest on all escrowed funds on a quarterly basis.  49 C.F.R. § 376.12(k).

270.   CRST Transportation failed to pay interest on Plaintiffs' escrowed funds and it failed to return the same to Plaintiffs upon the termination of their respective ICOAs and LPAs as required by 49 C.F.R. § 376.12(k)(5).

271.   Defendants unlawfully reduced Plaintiffs Wolf's, McKnight's, and McCain's weekly compensation by collecting monies at $.15-$.19 per mile from their income which were earmarked toward maintenance and the preservation of their LPA Vehicles by claiming such payments constituted "additional rent" payments for a "Comprehensive Maintenance Furnished by Lessor (CRST Lincoln and its assignee CRST Transportation)."

272.   Crutchfield was required to pay a minimum of $500.00 per week toward a maintenance escrow account.

273.   Even though Plaintiffs set aside monies for a comprehensive maintenance program, Defendants refused to perform comprehensive maintenance on

57

Plaintiffs McKnight's, McCain's, and Wolf's LPA vehicles with the monies they received from each.

274. The "additional rent" Defendants charged Plaintiffs for a comprehensive maintenance program that never existed and was part of CRST Lincoln's and CRST Transportation's scheme to unlawfully reduce Plaintiffs' compensation for their own use and gain. The illusory program violated the truth and leasing regulations.

275. CRST Transportation's and CRST Lincoln's retention of the funds Plaintiffs paid toward their escrow accounts and the comprehensive maintenance for which they never received, violates 49 C.F.R. §376. 12(k) and the funds must be returned.

276. Defendants overcharged Mr. Crutchfield and Mr. Wolf for maintenance items above the actual cost incurred. Plaintiffs are entitled to the return of these funds, plus interest and markup fees charged by Defendants.

277. In violation of the regulations, Defendants unlawfully charged Plaintiffs processing, administration, and loan fees when Plaintiffs sought to use their escrow funds and these monies are due to be returned.

278. Plaintiffs have been damaged by CRST Transportation and CRST Lincoln which unlawfully controlled how and when they used their respective Vehicles as contractors. CRST Transportation failed to assign Plaintiffs adequate

58

loads to cover the standard deductions Defendants required Plaintiffs to pay, while at the same time refusing to allow Plaintiffs to use their vehicles to make money for the deductions by hauling loads for other motor carriers.

279.  Plaintiffs paid for a comprehensive maintenance program, but Defendants refused  to authorize maintenance on the vehicles as necessary and/or as required or by refusing to release funds to Plaintiffs in violation of the regulations.

280.  Plaintiffs requested that CRST Transportation provide them with the rated freight bills or rate confirmations for the loads they transported because they needed to verify the amount of adjusted gross revenue billed by CRST Transportation.  CRST Transportation violated 49 C.F.R. § 376.12 (g) by refusing to produce the supporting documentation.

281.  CRST Transportation and CRST Lincoln failed to remit payments owed in the time prescribed by the regulations.  See 49 C.F.R.  § 376.12(f).

282.  As a result of CRST Transportation's and CRST Lincoln's actions and inaction, Plaintiffs have been damaged due to the reduction in their pay settlements, the loss of vehicle equity proceeds, the loss of their escrow funds and interest thereon, loss of security deposit, the unlawful deductions made against their compensation, the loss of their performance bond and all funds held in escrow, the overcharging for insurance and deductions, the unlawful line-haul percentage pay reductions, the

unlawful taking of funds paid toward maintenance for which they never received and Defendants' refusal to pay Plaintiffs the money they are owed.

283. Plaintiffs are entitled to recover the actual damages each sustained, attorneys' fees and costs, and the injunctive relief requested herein.

## COUNT II
## BREACH OF FIDUCIARY DUTY

Plaintiffs reallege and incorporate the facts alleged in the previous fact paragraphs 16-248 and make them a part hereof:

284. CRST Transportation and CRST Lincoln owed a fiduciary duty to Plaintiffs by virtue of their agreements and actions in billing for Plaintiffs' services, collecting their revenue, retaining escrow funds, paying insurers on their behalf and by virtue of their duty to account for those funds and for revenue billed as a result of their efforts.

285. CRST Transportation undertook and accepted this fiduciary duty for itself and as the assigned agent for CRST Lincoln by collecting and controlling Plaintiffs' revenue, escrowed funds, maintenance program funds, and by disbursing funds from Plaintiffs' pay settlements.

286. Additionally, Defendants collected and held information that was essential to the operation of Plaintiffs' business as independent contractors and/or

60

lease-purchase operators. Plaintiffs did not have access to this information, even though they were supposed to be given access to it by CRST Transportation and CRST Lincoln pursuant to law.

287. CRST Transportation collected and held information concerning the customers' payments to CRST Transportation for loads Plaintiffs hauled that was essential to in the operation of Plaintiffs' business as independent contractors and/or lease-purchase operators.

288. CRST Transportation breached its fiduciary duty to Plaintiffs in a number of ways including among others: by improperly reducing they pay with inflated and illegal deductions, including charging them for occupational insurance when none was required or provided; controlling when and at what price repairs would be done on their trucks, all the while collecting monies for each mile traveled which Defendants falsely claimed was for Plaintiffs' comprehensive maintenance program; by refusing service for Plaintiffs' Vehicles by designating the insurer for Plaintiffs' trucks and the insurance products Defendants required Plaintiffs to purchase from Defendants' direct affiliates; by failing to return the escrow funds and interest thereon acquired from Plaintiffs; converting the truck itself and additional equipment installed and purchased by Plaintiffs (McKnight, McCain, and Wolf); and by encumbering the truck's use which interfered with Plaintiffs' ability to make a

61

living.

289.   Defendants engaged in self-dealing to Plaintiffs' detriment by using Plaintiffs' funds for Defendants' own use and gain.

290.   Defendants had a duty to prudently manage and safeguard Plaintiffs' funds they collected and held on Plaintiffs' behalf, but breached the duty by engaging in self-dealing.

291.   At all times the foreseeable economic damage caused by Defendants' breach could have been avoided if the agent had notified Plaintiffs.

292.   As a direct and proximate cause of Defendants breach of their fiduciary duty, Plaintiffs  have and continue to be damaged.

## COUNT III
## BREACH OF CONTRACT

Plaintiffs re-allege and incorporate the allegations of the previous fact paragraphs 16-248 and make them a part hereof.

293.   On April 6, 2022, Mr. McKnight entered into an ICOA with CRST Transportation.

294.   On April 7, 2022, Mr. McKnight executed CRST Lincoln's LPA and took possession of his LPA Vehicle.

295.   Since October 2011, Mr. Wolf has worked for CRST Transportation and

62

CRST Lincoln as a lease-purchase owner-operator and during that time he executed LPAs and ICOAs for W768FM (November 23, 2021 through April 19, 2022), 616975 (April 19, 2022 through August 26, 2022); W349ZM (August 26, 2022 through February 16, 2024). On February 16, 2024, Mr. Wolf's LPA Vehicle W349ZM broke down and CRST Transportation refused to release funds for maintenance and it required Wolf to execute a lease purchase agreement for Unit 104518 with CRST Equipment Solutions, Inc. to keep his job as an ICOA driver. Wolf maintains that CRST Transportation and CRST Lincoln breached the terms and conditions of the ICOAs and LPAs concerning vehicles W768FM, 616975, and W349ZM.

296. On February 20, 2022, Mr. McCain entered into an ICOA with CRST Transportation and an LPA with CRST Lincoln. He operated under these agreements until they were terminated on December 8, 2022.

297. On November 1, 2019, Mr. Crutchfield executed an ICOA with CRST Transportation and worked for CRST Transportation until the agreement was terminated on August 21, 2021 after he provided a two-week notice of termination caused by Defendants' pay practices.

298. Plaintiffs reasonably tendered all performance as required under the LPAs and ICOAs to the best of their ability under the circumstances plead herein.

299. CRST Lincoln undertook a contractual obligation to lease the subject

63

vehicle to Mr. McKnight, Mr. Wolf, and Mr. McCain without unlawful intrusion and they breached the LPA and ICOA by failing to provide the same.

300.    CRST Transportation undertook a contractual obligation to pay Plaintiffs in accordance with the ICOA and federal regulations and Defendants breached this duty by underpaying Plaintiffs' compensation, by overcharging Plaintiffs for deductions well beyond the actual cost of each deduction, by unlawfully profiting from the sale of insurance, and by refusing to timely pay Plaintiffs.

301.    CRST Transportation and CRST Lincoln breached their contracts with Plaintiffs by deducting monies from Plaintiffs compensation for goods and services Plaintiffs never received.

302.    CRST Transportation and CRST Lincoln also breached their covenant of good faith and fair dealing by depriving Plaintiffs the open enjoyment and use of their Vehicles as required and permitted by law.

303.    Defendants breached their agreements with Plaintiffs by the following:

A.      CRST Transportation and CRST Lincoln deducted the weekly installment payments and fees for such agreements from the compensation of but failed to account for those.

B       CRST Transportation deducted numerous charges from Plaintiffs' pay settlements but failed to provide them the documents necessary to check the validity of each deduction.

C.      CRST Transportation overcharged Plaintiffs for each deduction

64

made against Plaintiffs' compensation beyond the actual cost for each deduction.

D.     CRST Transportation failed to pay interest on Plaintiffs' escrow funds or to account for those despite its obligations under the truth in leasing regulations.

E.     CRST Transportation failed to return Plaintiffs' escrow funds.

F.     CRST Transportation failed to provide freight bills and rate confirmations as requested by Plaintiffs to verify the charges stated in settlement statements.

G.     CRST Lincoln and CRST Transportation breached their agreements by charging Mr. McKnight, McCain, and Wolf for a comprehensive maintenance program and prevented Plaintiffs from using the same to repair their LPA vehicles.

H.     CRST Transportation collected additional monies each week for Crutchfield's maintenance and general flat rate escrow account and then made unlawful deductions from those funds and charged Mr. Crutchfield excessive fees to access his funds.

I.     CRST Lincoln and CRST Transportation breached their agreements with Plaintiffs by interfering with Plaintiffs' use and quiet enjoyment of their Vehicles to the point it made and/or is making continued performance under the LPA and ICOA impossible.

J.     At all relevant times, Defendants changed and/or manipulated the times it pays Plaintiffs' settlements forcing Plaintiffs to accrue additional expenses prior to hauling the next load in breach of the agreements. By manipulating the payments, Defendants prevented Plaintiffs from getting ahead financially.

304.   As a result of CRST Transportation's and CRST Lincoln's breach,

Plaintiffs have been damaged and continue to be damaged.

65

## COUNT IV
## CONVERSION

Plaintiffs re-allege and incorporate the allegations of the previous fact paragraphs 16-248 and make them a part hereof:

305.   CRST Transportation and CRST Lincoln, without right or permission, have improperly exercised illegal dominion and control over Plaintiffs' property and the earmarked funds Plaintiffs entrusted to Defendants for a specific purpose.

306.   CRST Transportation and CRST Lincoln converted for their own use with no intention of returning Plaintiffs' truck equity payments, the trucks, the equipment installed therein, and Plaintiffs' escrowed funds.

307.   Since at least 2014, Defendants have employed pattern and practice of converting the personal property and earmarked funds owned by its LPA and ICOA drivers.

308.   Defendants' conversion of Plaintiffs' property was knowing, intentional, and malicious.

309.   As a proximate result of this conversion, Plaintiffs have been damaged.

310.   Plaintiffs are entitled to damages equal to the full value of assets at the time of CRST Transportation's and CRST Lincoln's conversion, as well as punitive damages.

## COUNT V
## UNJUST ENRICHMENT
### (Plaintiffs McCain, Wolf, and McKnight against Defendants)

Plaintiffs re-allege and incorporate the allegations of the previous fact paragraphs 16-248 and make them a part hereof:

311.   Defendants have been unjustly enriched by their deductions from the wages of Plaintiffs and by the unconscionable fees extracted by Defendants that shift virtually all costs of maintaining Defendants' fleet and general business operations to Plaintiffs.

312.   Under the circumstances, it would be inequitable for Defendants to retain the amounts deducted from Plaintiffs' wages and the fees paid by Plaintiffs, who are in fact Defendants' contractors in name only as Defendants controlled all aspects of their employment, including the use of the LPA Vehicles.

313.   As a result of their conduct, CRST Transportation and CRST Lincoln have been unjustly enriched at the expense of Mr. McKnight, Mr. Wolf, and Mr. McCain by receiving and taking money Plaintiffs paid to them for a Comprehensive Maintenance Program to be furnished by Defendants as detailed above.

314. From April 2022 and continuing through April 2023, CRST Transportation and CRST Lincoln collected, received, controlled, and used the $12,082.20 Mr. McKnight paid Defendants for a comprehensive maintenance

67

program (in name only) he never received.

315. From at least May 2021 and continuing through the present, CRST Transportation and CRST Lincoln have collected from Wolf an average of $5,615.80 per quarter as payment for a comprehensive guaranteed maintenance program for which he never received a benefit. In addition, Defendants were also unjustly enriched by overcharging Wolf for maintenance costs for Units W768FM, 616975, and W349ZM for the preceding four years.

316. From February 20, 2022 and continuing through December 8, 2022, CRST Transportation and CRST Lincoln collected at least $.15/per mile traveled and deposited the same in a comprehensive guaranteed maintenance account for Chris McCain. McCain was told the money would be used to provide him maintenance as needed. The maintenance program was in name only as Defendants took the funds they collected for their own gain and use and deprived any payments toward maintenance for McCain's LPA Vehicle.

317. From November and continuing through August 21, 2023, CRST Transportation and CRST Lincoln collected, received, controlled, and used at least $5,937.75 paid into Crutchfield's Flat Rate Maintenance escrow account to pay for Defendants' unauthorized deductions which were not maintenance related. Upon information and belief, this figure is actually greater, but discovery is needed to

determine the exact amount.

318. Despite Defendants receiving Plaintiffs' monies paid toward the comprehensive maintenance of their vehicles, Defendants refused at all relevant times to use the collected funds to provide the comprehensive maintenance that was necessary or required to maintain Plaintiffs' vehicles in great working order.

319. Instead, CRST Lincoln and CRST Transportation were unjustly enriched by their receipt and use of the funds for their own use and gain and to the detriment of Plaintiffs.

320. Mr. McKnight, Mr. Wolf, Mr. McCain, and Mr. Crutchfield demand judgment against Defendants, jointly and severally, to compensate them for the losses they each incurred.

## COUNT VI
## FRAUD

Plaintiffs re-allege and incorporate the allegations of the previous fact paragraphs 16-248 and make them a part hereof.

321. CRST Transportation and CRST Lincoln made false statements to Plaintiffs regarding their payment and rate structure, chargeback deductions, escrow accounts, and comprehensive maintenance program coverage.

322. Defendants made false representations to Plaintiffs and Drivers regarding

the amount of money they would make as LPA/ICOA DRIVERS.

323. The ways Defendants misrepresented and defrauded Plaintiffs throughout their employment included, but were not limited to:

      i.    CRST Transportation charged different rates to its customers and quoted lesser rates for those loads delivered by Plaintiffs, thereby paying Plaintiffs throughout the LPA term;

      ii.    CRST Transportation and CRST Lincoln promised Plaintiffs a certain pay structure and comprehensive guaranteed maintenance programs furnished by lessor in their standardized contracts to Plaintiffs in order to induce their performance knowing they had no intent to honor that structure;

      iii.    Defendants mislead Plaintiffs and other LPA owner-operators under their pattern and practice to charge-back policies, administrative fee costs, labor rate charges, parts prices, and maintenance costs by overcharging for the deductions;

      iv.    Defendants misrepresented to Plaintiffs that their pay would be provided within the time frame required by the truth-in-leasing regulations, knowing that they had a worked in concert to create a policy and practice of failing to provide Plaintiffs' compensation, incentive pay, and escrow payments in full or within the time permitted by the statute;

70

v. Defendants mislead Plaintiffs and owner-operators under their pattern and practice as to the documentation necessary to receive pay and/or the manner in which such documentation must be provided, then refusing to pay some or all of the monies owed in violation of its agreements.

vi. Defendants have a pattern and practice of misrepresenting to Plaintiffs they could purchase their vehicle upon request at any time during the lease term and/or that they could freely use the same without interference or intrusion. Defendants made these misrepresentations while having no intent to honor Plaintiffs' right to purchase or to fully use their own vehicle during the contract term.

vii. Defendants made false statements to Plaintiffs at the time they signed their respective LPAs and ICOAs about the number of CRST Transportation's and CRST Lincoln's LPA owner-operators who successfully paid for and acquired their LPA vehicle from CRST Transportation to induce Plaintiffs to contract. At the time such statements were made to Plaintiffs, CRST Transportation and CRST Lincoln had a pattern and practice of denying operators the right to pay off or freely use their trucks and overcharging LPA/ICAO owner-operators to prevent them from acquiring title to their LPA vehicle.

viii. CRST Transportation misrepresented to Plaintiffs that they were required to obtain occupational insurance as a condition of employment when in fact

no legal requirement under Iowa law existed. CRST deducted monies from the Plaintiffs' compensation then denied their access to compensation coverage when vehicles needed repairs.

ix.     Defendants mislead and misrepresented to Plaintiffs that the additional funds they paid for CRST Lincoln's comprehensive guaranteed maintenance program at the rate of $.15 - $.19 per mile would be used for the comprehensive maintenance of their LPA Vehicle. At the time the representations were made, Defendants knew they would pocket these funds instead of paying for Plaintiffs' maintenance needs.

x.     Defendants misrepresented to Plaintiffs that the LPA Vehicle each received had low miles and/or was in great used condition in order to induce Plaintiffs' acceptance and performance without disclosing the ill condition of the vehicles provided.

xi.     Defendants wilfully and knowingly concealed the true mileage of the LPA Vehicle Defendants unilaterally selected for Plaintiffs in order to induce their acceptance and performance, all the while knowing the LPA Vehicles had more miles than reflected by the odometer and/or more maintenance issues which were never disclosed on the odometer when they provided the LPA Vehicles to Plaintiffs.

xii.     Defendants misrepresented to each Plaintiff that they were

72

required to purchase physical damage insurance, non-trucking liability insurance, UM-UIM insurance, and bobtail insurance from its sister company/affiliate, Great Plains Casualty, as a condition of employment when in fact the law allowed them to freely purchase and shop insurance from other providers.

      xiii.  Defendants defrauded Plaintiffs from unlawfully profiting from the sale of insurance by charging Plaintiffs higher insurance premiums than the cost of the covered provided for each policy.

324.  CRST Transportation and CRST Lincoln had and has a pattern and practice of making false statements and misrepresentations to Plaintiffs to induce them to contract with CRST Transportation and CRST Lincoln in order to obtain funds and revenue generated by each Plaintiff.

325.  CRST Transportation and CRST Lincoln knew their statements concerning pricing, requirements, and payments to Plaintiffs were false or made statements of material facts to Plaintiffs with culpable ignorance of their truth or falsity because, inter alia:

      i.    CRST Transportation's and CRST Lincoln's agents were aware of pay rates promised to Plaintiffs and owner-operators, often in writing through text or e-mail, but then refused to honor those rates during Plaintiffs' tenure

      ii.    CRST Transportation's and CRST Lincoln's agents regularly

73

provided contradictory and misleading statements in response to Plaintiffs' pay disputes, or ignored Plaintiffs' requests for supporting documentation altogether.

iii.    CRST Transportation's and CRST Lincoln's agents regularly provided contradictory, misleading information regarding pay rates for specific customers' loads, charge backs, and other items. For McKnight, for example, this occurred with virtually every load from April 7, 2022 through February 5, 2023. For McCain, these false representations occurred between July 2022 through December 2022. For Wolf, these occurred from at least April 2021 to the present. For Crutchfield, the misleading statements were largely made from November 2022 through August 2023.

iv.    CRST Transportation's and CRST Lincoln's agents had a policy and practice of unilaterally changing contract terms regarding payment, maintenance programs, deductions, purchase provisions, and termination without the owner-operators' consent or knowledge, in violation of their contracts, and ignored questions from Plaintiffs and other operators about the changes made.

v.    CRST Transportation had a policy and practice of promising its potential LPA owner-operators, including Plaintiffs, that LPA Drivers and company drivers had equal access to haul the high-paying loads CRST Transportation received, knowing at the time such representations were made that CRST Transportation

74

routinely gave the high paying loads to its company drivers without providing CRST Transportation's LPA owner-operators the right to select the load.

vi.    CRST Transportation's and CRST Lincoln's agents acted jointly to deny supporting charge and rate information to Plaintiffs and other owner-operators who questioned their pay, such as freight bills, rate confirmation sheets, and charge back costs bills. Defendants refused Plaintiffs' requests and claimed the pay settlement statements were sufficient.

vii.    Plaintiffs and other LPA owner-operators repeatedly complained to CRST Transportation's and CRST Lincoln's agents of pay discrepancies and have brought these unlawful practices to Defendants' attention internally, yet Defendants knowingly refused to change their unlawful practices. In response to the requests, Defendants retaliated against Plaintiffs by charging them for alleged overpayments without providing any supporting information.

viii.    CRST Transportation and CRST Lincoln had a pattern and practice of knowingly making false statements to Plaintiffs and other owner-operators about how they could use their escrowed funds, additional payments made for the comprehensive maintenance program, and/or how Defendants would seek to use the escrowed funds. Both CRST Transportation and CRST Lincoln told Plaintiffs the money they deposited in the general escrow, performance bond escrow, and

comprehensive maintenance program accounts, and tax/toll/permit escrow accounts

with Defendants was their money to be used for their benefit, knowing Defendants

had no intention to allow Plaintiffs to use or withdraw their escrowed funds for their

benefit. When CRST Transportation and CRST Lincoln made these statements, they

knew such statements were not true because they would ultimately confiscate, take,

and convert the monies Plaintiffs entrusted to them, as well as Plaintiffs' final pay

when they decided to terminate the ICOAs and LPAs.

326. CRST Transportation intended that Plaintiffs would rely on its promises

and statements in choosing to contract initially, and in continuing to entrust their

monies with them.

327. Plaintiffs relied upon CRST Transportation's and CRST Lincoln's false

statements in making business decisions, as evidenced by, inter alia:

i.      Choosing to contract with CRST Transportation and CRST

Lincoln based on CRST Transportation's and CRST Lincoln's representations as to

its escrow accounts, pay rates and pay structure, and their ability to own their own

truck and business;

ii.     Choosing to accept certain loads based on quoted rates, only to

discover that CRST Transportation paid a less percentage pay than it actually

received from the customer;

76

iii.    Choosing to deposit funds in the general escrow account, performance bond escrow account, tax/title/permit escrow, and maintenance program account managed by CRST Transportation and CRST Lincoln only to discover that Defendants would claim their funds as their own;

iv.    Choosing to accept a position with CRST Transportation and CRST Lincoln as their ICOA/LPA driver based on the representation that loads would be equally offered to CRST Transportation's company and its LPA drivers, only to discover that CRST Transportation gave the highest paying loads first to its company drivers;

v.    By relying on CRST Transportation's and CRST Lincoln's statements concerning occupational and workers compensation insurance and paying for the same only to discover they were not required by law to carry the insurance;

vi.    By paying their lease purchase payments to CRST Transportation toward the purchase of their LPA vehicle, only to discover CRST Transportation and CRST Lincoln would jointly work together to interfere with their use and enjoyment of the LPA Vehicle;

vii.    By paying for standard deductions and insurance to Defendants only to discover Defendants overcharged for each deduction.

328.    To date, Defendants have withheld the necessary rate confirmation,

chargeback cost documentation, rated freight-bills, and insurance certificate/ policy/ premium information Plaintiffs need to determine the full extent of their damages.

329. As a direct and proximate result of CRST Transportation's and CRST Lincoln's fraudulent conduct, Defendants damaged and continue to damage Plaintiffs as follows: by underpaying Plaintiffs; overcharging Plaintiffs; taking Plaintiffs' escrow and maintenance program money with the promise Plaintiffs could use the same; taking Plaintiffs' trucks; taking the equity Plaintiffs paid toward owning Plaintiffs' own truck; by fraudulently inflating the amounts and types of insurance required while profiting from the overages charged; by fraudulently inducing Plaintiffs to contract, and by their continued fraud during the LPA/ICOA term so that Plaintiffs would continue to do business with CRST Transportation and CRST Lincoln.

## COUNT VII
## VIOLATIONS OF THE FEDERAL VEHICLE INFORMATION AND COST SAVINGS ACT (the "Odometer Act") 49 U.S.C. §§ 32701, 32710(a)-(b) *et. seq.* (McKnight vs. Defendants)

Plaintiffs re-allege and incorporate the allegations of the previous fact paragraphs 16-248 and make them a part hereof.

330. As a lender, dealer, and motor carrier, Defendants have an obligation to properly represent and convey correct and truthful details concerning each vehicle

78

leased/purchased and/or sold to contractors.

331.    Defendants defrauded McKnight of the actual odometer miles his LPA Vehicle had traveled prior to McKnight's ownership and possession under his LPA.

332.    At all times prior to receiving his LPA Vehicle and signing his LPA with CRST Lincoln, Defendants CRST Lincoln and CRST Transportation assured Mr. McKnight he was receiving a lightly used LPA Vehicle with low miles. Defendants each assured Mr. McKnight the LPA Vehicle they were assigning to him was in great condition. Despite such assurances and Mr. McKnight's requests, Defendants never provided any government disclosures or logs concerning the vehicle's history, condition, or mileage before it assigned the LPA Vehicle to Mr. McKnight.

333.    Mr. McKnight agreed to execute the LPA in order to receive what he believed to be a low mileage lease purchase vehicle.

334.    Mr. McKnight was so excited about receiving a low mileage vehicle that he took a picture of the vehicle's odometer when he took possession on April 7, 2022.

335.    On June 1, 2022, Mr. McKnight took his LPA Vehicle in for its preventative and routine maintenance service. During this service, the mechanics checked the vehicle and its electronic control unit (ECU) and modules (ECM). After reading the LPA Vehicle's ECU and ECM and setting the system, the vehicle's actual mileage of 305,209 was immediately displayed on the vehicle's odometer. When

79

McKnight picked up the LPA Vehicle he was shocked, depressed, and he felt robbed by CRST Lincoln and CRST Transportation.

336.    At the time the LPA was signed, CRST Transportation and CRST Lincoln required Mr. McKnight to signed many documents, but they did not permit Mr. McKnight to review the logs of the LPA Vehicle he was provided, despite his request.

337.    The transfer forms for the LPA were not the official, secured forms as required by the Odometer Act, see 49 C.F.R. § 580.4 (2000), and the documents provided did not contain certain mandatory disclosures.

338.    Instead, Defendants showed McKnight the LPA Vehicle's mileage and bragged about how he was receiving such a low mileage LPA Vehicle.

339.    Defendants used their own forms and devices to conceal what the odometer reading would have revealed. Mr. McKnight would not have accepted the terms of the LPA, the LPA Vehicle, or taken possession of such a high mileage LPA Vehicle had he known its actual mileage.

340.    Defendants defrauded, misrepresented, and intentionally concealed the Vehicle's actual mileage in order to induce Mr. McKnight's performance and acceptance of the LPA Vehicle.

341.    CRST Lincoln and CRST Transportation intended to defraud Mr.

McKnight in violation of the Odometer Act because they rolled back the miles on the odometer prior to executing the LPA contract with Mr. McKnight and prior to assigning him the LPA Vehicle.

342. Defendants jointly and severally violated the Odometer Act and are liable to Mr. McKnight for three times the actual damages he incurred or $10,000.00, whichever is greater, *see* 49 U.S.C. § 32710(a), and attorneys' fees and costs in accordance with the statute. 49 U.S.C. § 32710(b) .

343. Mr. McKnight demands judgment against Defendants, jointly and severally, to compensate him for the losses incurred.

**COUNT VIII**
**UNLAWFUL DEDUCTIONS IN VIOLATION OF**
**IOWA'S WAGE PAYMENT COLLECTION LAW**
**Iowa Code § 91A.1, et seq**
**(Against CRST Transportation)**

Plaintiffs re-allege and incorporate the allegations of the previous fact paragraphs 16-248 and make them a part hereof.

344. CRST Transportation's classification of Drivers as independent contractors forms a significant part of a labor scheme crafted to shift CRST's business expenses and risk to the LPA/ICOA Drivers, while profiting from the revenue drivers generated for CRST Transportation.

345. By misclassifying LPA/ICA Drivers as independent contractors, CRST

Transportation also evades the tax burdens that it would bear for employees – e.g., Social Security, Federal Unemployment Tax, state tax, which burdens are also shifted to the misclassified Drivers.

346. By unlawfully treating Drivers as independent contractors, CRST obtains a vast competitive advantage over competitor trucking companies that properly treat their drivers as employees and pay required wages and taxes in compliance with federal and state law.

347. Since at least October 2014, if not before, CRST knowingly misclassified Drivers, including Plaintiffs, as independent contractors and made unlawful deductions from their earned compensation.

348. Pursuant to the Iowa Wage Payment Collection Law, Iowa Code 91A.1, et seq., Defendants are required to pay all wages owed to its employees.

349. CRST Transportation labeling Plaintiffs as independent contractors when they control all aspects Plaintiffs' employment does not shield them from liability here.

350. Pursuant to Iowa Code § 91A.5, employers such as Defendants are not permitted to withhold or divert any portion of Plaintiffs' wages for any purpose unless the employer has a written authorization to divert or withhold such wages for a lawful purpose and if the withholding is for the benefit of the Plaintiffs.

82

351. Defendants had a policy and practice of intentionally failing to pay Plaintiffs all wages due as set forth in the preceding paragraphs in violation of the Iowa Wage Collection Law, Iowa Code § 91A.1., et seq., and Iowa Code § 91A.5 by unlawfully deducting amounts from Plaintiffs' wages.

352. The deductions from Plaintiffs' pay as set forth in the preceding paragraphs are unlawful and accrue to the benefit of Defendants' and are not for the benefit of the Plaintiffs. There is also no valid written authorization from Plaintiffs that permits Defendants to deduct amounts from Drivers' pay.

353. Pursuant to the Iowa Wage Collection Law, Iowa Code § 91A.1., et seq., and specifically Iowa Code § 91A.8, Defendants are liable to Plaintiffs and Drivers for wages not paid, withheld, and/or unlawfully deducted, plus liquidated damages, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

354. This claim is brought on behalf of Plaintiffs against all Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon hearing of this matter, the Court and jury will:

1. Award compensatory damages against CRST Transportation and CRST Lincoln, jointly and severally, in favor of Plaintiffs for damages each has suffered;

2.      Award statutory, compensatory, liquidated damages, restitution, and appropriate statutory penalties to Plaintiffs against CRST Transportation and CRST Lincoln, jointly and severally, for sums unlawfully deducted from Plaintiffs' compensation in violation of the Truth in Leasing Act, Truth in Leasing Regulations, and Motor Carrier Act, 49 C.F.R. § 376.12 et. seq., pursuant to 49 U.S.C. § 14704(a)(2) and 49 U.S.C. § 14704(b), plus interest, as allowed by law;

3.      Fashion appropriate equitable and injunctive relief to remedy Defendants' violations of law, including but not limited to an order determining that Defendants' practices in failing to adhere to the TILA-required ICOA provisions violate the TILA;

4.      Award compensatory, consequential, statutory damages, punitive damages, attorneys fees and costs as deemed appropriate under these facts to Plaintiffs against CRST Transportation and CRST Lincoln, jointly and severally, for their breach of contract, breach of fiduciary duty, conversion, fraudulent misrepresentation, and unjust enrichment and violations of the Iowa Wage Payment Collection Law, Iowa Code 91A.1 *et. seq.*.

5.      Award compensatory, consequential, and such punitive damages as deemed appropriate under these facts to Plaintiffs against CRST Transportation and CRST Lincoln, jointly and severally, for violations of the Odometer Act.

6.     Award Plaintiffs' counsel reasonable attorneys' fees, costs, and expenses pursuant to 49 U.S.C. § 14704(e) and 49 U.S.C. § 32710(b), and Iowa Code 91A.1 *et. seq.*.

7.     Enter a declaratory judgment declaring that CRST Transportation and CRST Lincoln violated 49 C.F.R. § 376.12(b)-(k) by holding CRST Transportation unlawfully did the following: interfered with Plaintiffs' use and ownership of their LPA vehicles; failed to pay Plaintiffs in time specified in the lease and regulations; unlawfully took Plaintiffs' escrowed funds; failed to provide copies of the rated freight bills or other forms of freight documentation on request; unlawfully reduced the stated revenue received from shippers/customers before calculating/paying Plaintiffs' compensation; and by unlawfully reducing Plaintiffs' compensation.

8.     Enter a declaratory judgment declaring that Defendants CRST Transportation and CRST Lincoln must produce all supporting documentation, rate confirmation sheets, and rated freight bills for every deduction and payment made to their LPA Drivers and ICOA Drivers.

9.     Enter a declaratory judgment declaring that Defendants CRST Transportation and CRST Lincoln must provide equal access to all customers' loads to its LPA Drivers, Company Drivers, and ICOA Drivers.

10.     Order CRST Transportation and CRST Lincoln to provide an accounting

of all revenue billed to and received from shippers as a result of Plaintiffs' services for their escrow accounts, the interest thereon and any disbursements, and/or charge backs;

11.     Awarding Pre-judgment and Post-judgment interest as otherwise provided by law;

12.     Award Plaintiffs such other relief as this Court may deem to be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by struck jury on all issues triable.

RESPECTFULLY SUBMITTED,


*/s/ Daniel Patrick Evans*
D. Patrick Evans, *Appearing Pro Hac Vice*
ASB-3209-R67G
The Evans Law Firm, P.C.
1736 Oxmoor Road, Suite 101
Birmingham, AL 35209
PHONE:  205-870-1970
FAX:     205-870-7763
dpevans@evanslawpc.com

*s/ Jay Smith*
Jay M. Smith
AT0007387
Smith & McElwain
418 Pierce Street
Sioux City, IA 51102

86

Telephone: 712/255-8094
Facsimile: 712/255-3825
E-mail: smitmcel@aol.com
***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on this the 10th day of February 2025, I electronically filed the foregoing Second Amended and Restated Complaint using the CM/ECF system which will send notifications of such filing to the following:

Thomas D. Wolle, Esq.
Simmons, Perrine, Moyer, Bergman PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
Telephone:  (319) 366-7641
Facsimile:  (319) 366-1917
E-mail: twolle@spmblaw.com
***Attorneys for Defendants***

<u>D. Patrick Evans</u>
*Of Counsel*

87